Elizabeth HARRIS, Petitioner,

v.

DISTRICT OF COLUMBIA COMMIS-
SION ON HUMAN RIGHTS,
Respondent,

Future Homemakers of
America, Intervenor.

No. 88–96.

District of Columbia Court of Appeals.

Argued May 15, 1989.
Decided July 20, 1989.

Charles Meyer, Law Student. Nancy L.
Cook, with whom Madeline Caliendo, Law
Student, was on the brief for petitioner.

Charles L. Reischel, Deputy Corp. Coun-
sel, and Martin B. White, Asst. Corp. Coun-
sel, filed a statement in lieu of brief for
respondent.

Daniel Schumack, with whom Ben Cotten and Patricia R. Collins were on the brief, for intervenor.

Before ROGERS, Chief Judge, and STEADMAN and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

■ The right to equal opportunity without discrimination based on race or other such invidious ground is protected by a policy to which both this nation and its capital city have accorded the "highest priority." *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972); *see Greater Washington Bus. Ctr. v. District of Columbia Comm'n on Human Rights*, 454 A.2d 1333, 1337 (D.C.1982) [*citing* D.C. Code § 1–2501 (1981)]. It is a warrant for the here and now, and not merely a hope of future enjoyment of some formalistic constitutional or statutory promise. *See Watson v. City of Memphis*, 373 U.S. 526, 533, 83 S.Ct. 1314, 1318, 10 L.Ed.2d 529 (1963). Indeed, racial discrimination cases are "pregnant with an urgency" that is incompatible even with conventional litigation delays, and they should be in every way expedited. *See United States v. Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers Local No. 1*, 438 F.2d 679, 681 (7th Cir.), *cert. denied*, 404 U.S. 830, 92 S.Ct. 75, 30 L.Ed.2d 60 (1971). Complainants have a constitutionally protected interest in having their claims of discrimination considered by the appropriate agency at a meaningful time and in a meaningful manner. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982).

In the present case, we are compelled to remand to the District of Columbia Commission on Human Rights (the Commission) for further proceedings a case in which the complaint was filed almost thirteen years ago. It is better to light a candle than to curse the darkness. We appreciate the administrative problems which the Commission has had to confront, and are aware of its efforts to resolve them. In light of the age of the present case, however, we must direct that it be accorded appropriate priority on remand.

## II

### PROCEDURAL HISTORY

This is an appeal from a final order of the Commission dismissing a complaint filed by appellant Elizabeth Harris, a black woman, alleging racial and sexual discrimination in employment by Intervenor Future Homemakers of America (FHA) in violation of the District of Columbia Human Rights Act. *See* D.C.Code § 1–2512 (1984). Ms. Harris had filed a complaint against FHA on July 23, 1976, following the abolition of her position as accounting control technician. On February 11, 1977, the Office of Human Rights found probable cause to believe that racial discrimination had occurred. In August and October 1981, more than five years after the complaint was filed, the parties presented evidence before a hearing examiner. On December 22, 1986, more than five years after the hearing, the examiner issued a proposed Decision and Order for consideration by the Commission. He found that Ms. Harris had been denied equal opportunity in employment because of her race,[1] and proposed that a hearing be held as to remedy. On December 30, 1987, more than a year after the hearing examiner's proposed decision, the Commission issued its final Decision and Order. The Commission concluded, contrary to the recommendation of the hearing examiner, that FHA had not unlawfully discriminated against Ms. Harris when it abolished her position.

On appeal, Ms. Harris contends that the Commission was required, as a matter of law, to accept the factual findings of the hearing examiner if they were supported by substantial evidence. She claims that his findings had the necessary evidentiary support, and that the proposed decision should therefore have been sustained. She also maintains that she was prejudiced by

---

1. The hearing examiner made no finding as to sex discrimination. Ms. Harris was replaced by a woman. Understandably, she has not pressed the issue of sex discrimination on appeal.

the Commission's inordinate delay, and that the proper remedy for that delay is to require the Commission to adopt the hearing examiner's proposed decision.

Although we disagree with Ms. Harris' contention that the substantial evidence rule applies, we are of the opinion that the Commission was obliged to explain on what basis it was rejecting the hearing examiner's factual findings, particularly those regarding the credibility of witnesses whose demeanor the examiner, but not the Commission, had the opportunity to observe. Accordingly, we remand for further proceedings. Since the Commission's delay prejudiced both parties, and since FHA was not responsible for it, we find unpersuasive Ms. Harris' contention that the lapse of time requires a decision on the merits in her favor.

### III

### THE FACTS

Ms. Harris was hired by FHA on August 29, 1973 as an Affiliation Coding Clerk. On February 1, 1974, she was promoted to Special Services Clerk. On September 24, 1974, after taking a civil service examination, she was promoted to Accounting Control Technician. In this position, Ms. Harris performed back-up functions for her immediate supervisor, Doris Rieve. She also took over some of Ms. Rieve's supervisory responsibilities when Ms. Rieve was absent from the office.

In January 1975, while acting as temporary supervisor, Ms. Harris complained to the Executive Director, Mildred Reel, about a subordinate, one Derek Dutch, concerning the quality of his work. When Ms. Rieve returned, she advised Ms. Harris that she found Mr. Dutch's work to be satisfactory, and that the issue should not have been raised with Ms. Reel in Ms. Rieve's absence.

Some time in 1976, Ms. Harris complained to Ms. Reel, again in Ms. Rieve's absence, that Mr. Dutch was playing his radio too loudly. Upon her return, Ms. Rieve told Ms. Harris that the matter had been handled inappropriately. Ms. Harris told Ms. Rieve that she did not wish to be assigned supervisory responsibilities if she would not be free to exercise her judgment. Ms. Rieve advised Ms. Harris that the back-up supervisory duties would be removed from her job description.

Meanwhile, in July of 1975, FHA had arranged for a study to be conducted by the American Society of Association Executives (ASAE) to evaluate FHA's operating procedures. One part of the study concentrated on the review of existing position descriptions. Charles Martenson, who conducted the analysis, recommended that Ms. Harris' department be reorganized, and that a position be created for a person with qualifications similar to Ms. Rieve's. He concluded that none of the employees had the appropriate qualifications for the new position. Mr. Martenson was unaware that Ms. Harris had been handling Ms. Rieve's supervisory responsibilities while Ms. Rieve was away from the office.

After the board of directors authorized the creation of a new position, plans were made to restructure Ms. Harris' department by adding two new positions and by terminating Ms. Harris' position. On June 30, 1976, Ms. Harris was advised by Ms. Reel that her job was being abolished. Ms. Harris was told that, because of the creation of the new employee position and the lack of funds available to pay another salary, a new employee would be hired to do the work previously assigned to her and to provide more back-up for Ms. Rieve in connection with her supervisory responsibilities. Ms. Harris was advised that she was not qualified to perform the new job. On or about July 6, 1976, Ms. Reel sent Ms. Harris a letter informing her that her position was being abolished.

On July 18, 1976, Ms. Harris responded in a letter in which she advised Ms. Reel that she wished to be considered for the new position. On July 19, 1976, Ms. Reel wrote a memo to Ms. Harris stating that she would be considered along with the other candidates. On or about September 14, 1976, however, a white woman, Shirley Encan, was offered the new position. Unfortunately, Ms. Encan died shortly before

she could begin work. Wayne Dunne, a white man, was then hired. Mr. Dunne was promoted to head bookkeeper, and continued to serve as back-up supervisor to Ms. Rieve. Susan Gibbs, a white woman, who subsequently replaced Mr. Dunne, was not required to perform back-up duties.

Ms. Harris' complaint was filed as a result of the events described above. In the proposed decision and order issued on December 22, 1986, the hearing examiner found, among other things, that:

Ms. Harris had never been contacted about her request to be considered for the new position;

Ms. Harris had been advised of only one complaint about her job performance by Ms. Rieve;

Ms. Rieve had at no time complained to Ms. Reel about Ms. Harris' job performance;

Charles Martenson, who had conducted the survey of FHA's operation in 1975, had not been made aware of Ms. Harris' role in performing Ms. Rieve's supervisory duties in her absence when he recommended hiring someone new for the newly created position.

The hearing examiner explicitly found that Ms. Rieve's testimony that she played no part in the decision to abolish Ms. Harris' position was not credible. He also found, contrary to the testimony of Ms. Rieve and Ms. Reel, that Ms. Rieve's absenteeism was one of the reasons for abolishing Ms. Harris' position and creating a new one. He further found that adequate back-up for Ms. Rieve could have been provided without terminating Ms. Harris or abolishing her position. He concluded that

... the complainant was terminated so that a person other than she could provide supervision in [Ms.] Rieve's absences, which were very frequent. Respondent [FHA] could therefore essentially hire a new supervisor without having to terminate [Ms.] Rieve due to her illness and absenteeism.

In its final Decision and Order, issued a year after the hearing examiner's proposed decision, the Commission made findings which conflicted with those of the examiner in several respects. The conflicts in the findings were based upon different assessments of the credibility of the witnesses whom the hearing examiner had heard. Specifically, the Commission found that Ms. Reel's testimony that the new position was not created in response to a need created by Ms. Rieve's absenteeism was credible. The Commission also concluded that Ms. Harris' position was abolished, and the new position created, to meet staffing and budgetary needs. These needs, which had been determined on the basis of the ASAE study, "precluded the maintenance of complainant's position, which was superfluous under the reorganization."

Both the proposed order and the final order alluded to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), as the controlling case authorities.[2] Both the hearing examiner and the Commission concluded, in accordance with the principles set forth in these decisions, that Ms. Harris had established a *prima facie* case of disparate treatment. The hearing examiner and the Commission also agreed that FHA had met its burden of articulating a legitimate and nondiscriminatory justification for its actions. The hearing examiner found, however, that this justification was pretextual and "that the reasons articulated by the respondent are unworthy of credence." The examiner made five specific factual findings in support of this conclusion. The Commission found, on the other hand, that Ms. Harris "had not demonstrated that the creation of a new position with additional responsibilities was a pretext for discrimination, nor that she was qualified and should have been hired for the new position." The Commission did not allude to any factual findings to support this conclusion, nor did it explain its disagreement

---

**2.** For a recent elaboration of the law as set forth in *Green* and *Burdine, see Price Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268. *See also RAP, Inc. v. District of Columbia Comm'n on Human Rights,* 485 A.2d 173, 176 (D.C.1984).

with the factual findings supporting the hearing examiner's contrary determination.

## IV

### THE STANDARD OF REVIEW

■ Ms. Harris argues that the Commission lacked authority to substitute its findings for those of the hearing examiner since the examiner's findings were supported by substantial evidence (*i.e.,* more than a "mere scintilla,"), or such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). *See also Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n,* 426 A.2d 327, 334 (D.C.1981). FHA counters that while this court is bound to review the Commission's final decision under such a standard, *see* D.C.Code § 1–1510(a)(3)(E) (1987 Repl. & 1988 Supp.); *accord, Wisconsin Ave. Nursing Home v. District of Columbia Comm'n on Human Rights,* 527 A.2d 282, 287 (D.C.1987), no such limitation exists with respect to the Commission's consideration of a hearing examiner's proposed decision.

Under our Human Rights Act, whenever the Office of Human Rights finds probable cause to believe that the complainant has been the victim of unlawful discrimination, it must conduct a public hearing before a hearing examiner or a panel of one or more members of the Commission. D.C.Code §§ 1–2545, 1–2550 (1987 Repl. & 1988 Supp.); *see Stevens Chevrolet, Inc. v. District of Columbia Comm'n on Human Rights,* 498 A.2d 546, 548–49 (D.C.1985). In Ms. Harris' case, a hearing examiner heard the evidence, but the final decision was made by three members of the Commission. *See id.* § 1–2551. Pursuant to the rules of procedure for contested cases promulgated by the Commission, the hearing examiner in Ms. Harris' case was "obliged to conduct a fair and impartial hearing." *See* District of Columbia Commission on Human Rights, "Rules of Procedure for Contested Cases," § 105.1, 31 D.C. Reg. 6267 (1984). Under § 129 of the Commission's rules, and in accordance with D.C.Code § 1–2553(c), he was required to, and in fact did, issue a proposed decision and order which included findings of fact and conclusions of law, as well as a notice to adversely affected parties of their rights to file exceptions to the proposed order within ten days.[3] The Commission then had fifteen days from either the date on which exceptions were filed or the date on which the time for filing exceptions expired to render a final decision and order. *Rules of Procedure, supra,* § 129.1(h), at 31 D.C. Reg. 6284.

According to Ms. Harris, the clear import of these statutes and regulations is that the findings of the hearing examiner will be adopted, and his proposed decision will become final, unless the Commission determines that the hearing examiner's findings are not grounded in substantial evidence or that his conclusions are contrary to law. Ms. Harris relies principally on our decision in *Dell v. Dep't of Employment Services,* 499 A.2d 102 (D.C.1985). We conclude, however, that *Dell* and its progeny,[4] which involve another agency, are not controlling here.

In *Dell,* this court held that the Department of Employment Services (DOES) had improperly rejected a hearing examiner's proposed decision in a worker's compensation case. The court noted that under the provisions of an applicable DOES regulation, credibility determinations by a hearing examiner may be rejected only if they are unsupported by substantial evidence. *Dell, supra,* 499 A.2d at 105. The court also stated that a hearing examiner's decision is normally entitled to particular deference when he has heard live testimony and observed the demeanor of witnesses. *Id.* at 106. The court distinguished federal precedents, which supported DOES' contention that the agency was not restricted to sub-

---

3. The Commission concededly violated all of these time limitations. In addition, FHA maintains that it was never served with the proposed and final orders in this case and only learned about the final disposition when Ms. Harris appealed.

4. *See Gunty v. Dep't of Employment Services,* 524 A.2d 1192 (D.C.1987).

stantial evidence review, on the grounds that the federal decisions were predicated on the language of the federal Administrative Procedure Act (APA). *Id.* at 107. The APA expressly provides that in reviewing the initial decision by the hearing examiner, an agency retains all the powers which it would have if it were making the initial decision. *Id. citing* 5 U.S.C. § 557(b) (1982). The District of Columbia Administrative Procedure Act (DCAPA) contains no such provision. The court concluded that "[t]he fact that such language appears in the federal statute but not in the DCAPA suggests that its omission was the product of a conscious choice by Congress when it enacted the DCAPA in 1968." *Id.* at 107 n. 5.

In *Gunty*, this court extended its earlier holding in *Dell* to a situation where no applicable agency regulation governed the standard of review within DOES. In so holding, the court reasoned that the DOES statute and regulations did not fairly express an intention to modify "traditional principles of administrative law" which afforded deference to the factual findings of hearing examiners. *Gunty, supra,* 524 A.2d at 1197. Accordingly, the court concluded that DOES was bound to accept a hearing examiner's decision which was supported by substantial evidence even in the absence of a regulation explicitly so providing. *Id.* at 1198.

We conclude that the case at bar is distinguishable from *Dell* and *Gunty* because the decision-making process of the Commission is fundamentally different from that of DOES. The statutes and regulations which govern the Commission's procedures do not have the character of a hierarchical system in which the hearing examiner makes an initial decision which is followed by an internal agency appeal. Rather, the hearing examiner makes a *recommended* decision, but the *final* decision is made by the Commission. *See* §§ 1–2551 to 1–2553. *See also Rules of Procedure, supra.* Accordingly, we conclude that the Commission's scope of review of the hearing examiner's proposed decision is not limited to a determination whether his findings are supported by substantial evidence. *Cf. Beste*

*v. Independent School Dist. No. 697,* 398 N.W.2d 58, 62–63 (Minn.Ct.App.1986); *Bruemmer v. Vecchio,* 93 A.D.2d 863, 863, 461 N.Y.S.2d 368, 369 (2d Dept.1983). After the Commission has issued its final decision, then this court may review the Commission's factual findings to determine whether there is substantial evidence to support them. *See* D.C.Code §§ 1–1510(a)(3)(E), 1–2554. *Accord, Wisconsin Ave. Nursing Home, supra,* 527 A.2d at 287; *RAP, Inc. v. District of Columbia Comm'n on Human Rights,* 485 A.2d 173, 177 (D.C.1984).

■ Although we do not apply the restrictions contemplated by *Dell* to the Commission's review of the hearing examiner's proposed decision, we cannot ignore the fact that it was the examiner, and not the Commission, who saw and heard the witnesses testify. In *Stevens Chevrolet, Inc., supra,* 498 A.2d at 449–50, this court emphasized the importance of credibility evaluations by the individual who "saw the witnesses first hand," and placed the burden on the agency to persuade the reviewing court that the case could be decided without a determination by that individual as to credibility. As Judge Tamm stated for the court in *Cinderella Career and Finishing School, Inc. v. FTC,* 138 U.S. App.D.C. 152, 158, 425 F.2d 583, 589 (1970):

> If [commissioners] choose to modify or set aside [the hearing examiner's] conclusions they must state that they are doing so and they must give reasons for doing so. To hold otherwise is to ignore the objectives of adversary proceedings before the Commission. Only if such rules are carefully adhered to can a reviewing court properly analyze the action taken by the Commission; only then can the wheat of meaningful agency action be separated from the chaff of arbitrary and capricious conduct.

*See also Int'l Brotherhood of Teamsters v. NLRB,* 190 U.S.App.D.C. 279, 283–84, 587 F.2d 1176, 1181 (1978). In the present case, the Commission ignored the hearing examiner's assessment of the credibility of the witnesses and, without any explanation, substituted credibility findings of its own.

We therefore conclude that the case must be remanded to the Commission for an explanation of its departure from the hearing examiner's findings, especially from those as to credibility.

## V

## THE ADEQUACY OF THE EXAMINER'S CREDIBILITY FINDINGS

■ FHA contends, however, that it is entitled to a finding of no discrimination on this record as a matter of law. It argues, in pertinent part, as follows:

> Other than the proposed order itself, nothing in the record indicates or suggests FHA's witnesses were unworthy of credence. The tape summary contains *not even a hint* that FHA's witnesses were not credible; instead, it reports that each FHA witness offered consistent testimony of non-discriminatory reasons for the termination of Petitioner's position. Similarly, the final order, written after review of all evidence, including the hearing tapes and tape summary, squarely finds FHA's witnesses worthy of credence.
>
> Against this background, *more than five years after he saw the witnesses,* the hearing examiner wrote his proposed order containing three curt, unsubstantiated proposed findings that FHA's witnesses were not credible. Yet at no point did the hearing examiner raise any facts in support of these findings: nothing about any witness' eye contact, voice intonation, responsiveness to questioning, appearance or demeanor; nothing about consistencies or inconsistencies within a witness' testimony or consistency comparisons between the testimony of several witnesses. In short, none of the traditional bases underlying incredibility findings exist in the record; on such a record, the hearing examiner's bare assertions of incredibility must fall.

(Emphasis in original.)

Although these arguments can legitimately be presented to the Commission as reasons for rejecting the hearing examiner's findings, they do not persuade us that the requisite evidence of discrimination was so lacking that he was obliged to find for FHA as a matter of law. Impartial triers of fact are not required to believe denials by persons charged with unlawful discrimination that they harbored the proscribed intent. Even in the then embattled state of Mississippi seventeen years ago, "most persons [would] not admit publicly that they entertain any bias or prejudice against members of the Negro race." *United States v. Real Estate Development Corp.,* 347 F.Supp. 776, 783 (N.D.Miss.1972), quoting from *Dailey v. City of Lawton,* 296 F.Supp. 266, 268 (W.D.Okla.1969), *aff'd,* 425 F.2d 1037 (10th Cir.1970). As the appellate court aptly observed in *Dailey, supra,* in the analogous context of racial discrimination by a public agency:

> If proof of a civil rights violation depends on an open statement by an official of an intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection.

425 F.2d at 1039.

It has long been recognized in discrimination cases that a person is presumed to intend the foreseeable consequences of his conduct. *See, e.g., Rabinowitz v. United States,* 366 F.2d 34, 56 (5th Cir.1966). Here, the effect of what FHA did was to eliminate a black woman's job and to replace her with a white woman and then a white man. This did not compel the trier of fact to find that the employer's intention was discriminatory. By the same token, however, the hearing examiner was not required to take at face value the assurance by FHA representatives that their intent was benign.

It would have been helpful if the hearing examiner had explained whether his credibility findings were predicated in any measure by the demeanor of FHA's witnesses. He was not, however, required to do so. *See, e.g., Porter v. Dep't of Employment Services,* 518 A.2d 1020, 1023 (D.C.1986); *cf. Baker's Local Union No. 118 v. District of Columbia Board of Zoning Adjustment,* 437 A.2d 176, 178–79 (D.C.1981)

(an agency generally is free to credit,[5] without explanation, non-expert testimony of a witness).

It would also have been helpful if the parties, the hearing examiner, or the Commission had developed information about the racial composition of FHA's work force. As Judge Brown stated for the court in *Burns v. Thiokol Chemical Corp.*, 483 F.2d 300, 305 (5th Cir.1973):

> "In the problem of racial discrimination, statistics often tell much, and Courts listen." *Alabama v. United States*, 5 Cir., 1962, 304 F.2d 583, 586, *aff'd*, 1962, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112.... Our wide experience with cases involving racial discrimination in education, employment, and other segments of society have led us to rely heavily in Title VII cases on the empirical data which show an employer's overall pattern of conduct in determining whether he has discriminated against particular individuals or a class as a whole.

As the Supreme Court specifically observed in *McDonnell–Douglas, supra*, 411 U.S. at 804–05, 93 S.Ct. at 1825, an employer's general policies with respect to minorities are relevant to the issue of pretextuality. *Cf. Wards Cove Packing Co., Inc. v. Atonio*, — U.S. —, —, 109 S.Ct. 2115, 2119–23, 104 L.Ed.2d 733 (1989) (appropriate statistical evidence may make out *prima facie* case of disparate impact). *See also* the majority and concurring opinions in *Miller v. Poretsky*, 193 U.S.App.D.C. 395, 595 F.2d 780 (1978).

Ms. Harris' experiences as reflected in this record are devoid of context. If she was the only black person employed by FHA in a relatively responsible job, the abolition of her position would be a good deal more suspect than if black people were well represented at all levels of employment. We must, however, take the record as we find it and, so many years later, it

would be quixotic to expect the parties now to reconstruct the racial composition of FHA or of its affected departments at the time that this controversy began.

## VI

### DELAY AS THE BASIS FOR RELIEF AGAINST THE EMPLOYER

■ Inviting our attention to the chronology described in our Prologue, Ms. Harris invites us to find that she was prejudiced by the substantial delays and that she is therefore entitled to prevail. FHA understandably responds that it was not responsible for the delays, that it too has been prejudiced,[6] and that it is illogical to grant relief to one innocent litigant against another innocent litigant on the basis of delays occasioned by the very agency which was supposed to provide a prompt and impartial resolution of their dispute. This court has stated that "individuals or the public should not be made to suffer for the dereliction of public officers." *J.G.B. Properties, Inc. v. District of Columbia Office of Human Rights*, 364 A.2d 1183, 1185 (D.C.1976), quoting from 2A SUTHERLAND, STATUTORY CONSTRUCTION § 57.19, at 445 (Rev. 3d ed. 1973). In *Choate v. Caterpillar Tractor Co.*, 402 F.2d 357, 361 (7th Cir.1968), the court held under somewhat comparable circumstances that

> the complainant should not be made the innocent victim of a dereliction of statutory duty on the part of the commission.
>
> \* \* \* \* \* \*
>
> [He] should not be made to suffer innocently for administrative delays for which he is not responsible.

*Accord, Dent v. St. Louis–San Francisco Railway Co.*, 406 F.2d 399, 403 (5th Cir. 1969). What is sauce for the goose is sauce for the gander; this employer cannot be held liable as a result of the failure of the Commission to do its job on time.[7]

---

**5.** Or, we think, not to credit.

**6.** In particular, we are advised that Doris Rieve has died and that the present whereabouts of Mildred Reel are unknown.

**7.** Assuming that, in an extreme case, agency inaction could require dismissal of a proceeding

where, as a result of delay for which neither litigant is responsible, one party's ability to defend is eviscerated, *see Wisconsin Ave. Nursing Home, supra*, 527 A.2d at 285, there is no evidence here that Ms. Harris' ability to prosecute this proceeding has been so destroyed.

If Ms. Harris was aggrieved by the pace at which the Commission was proceeding, she could have requested expedition, or even petitioned the court for a writ of *mandamus.* Having taken none of these steps, she cannot invoke the unfortunate passage of time, which prejudiced *both* litigants, to claim a substantive result favorable to herself.[8]

## VII

## CONCLUSION

We hope that this case can now be resolved fairly and with dispatch. We direct that the Commission issue a new Decision and Order consistent with this opinion, according the matter appropriate priority consistent with its age. *Cf. Wisconsin Ave. Nursing Home, supra,* 527 A.2d at 293.

*Remanded.*

---

**8.** Ms. Harris also complains that, as a result of the delays in the case, the Commissioners who ultimately decided it were different persons from those who would have made the ruling if the matter had proceeded with dispatch. This contention is unpersuasive. *See Blacknall v. District of Columbia Rental Housing Comm'n,* 544 A.2d 710, 712 n. 2 (D.C.1988).