Jon W. EILERS, Petitioner,

v.

**DISTRICT OF COLUMBIA BUREAU OF MOTOR VEHICLES SERVICES, Respondent.**

No. 89–741.

District of Columbia Court of Appeals.

Argued Sept. 7, 1990.

Decided Dec. 7, 1990.

George Anthony Fisher, Washington, D.C., for petitioner.

Mary L. Wilson, Asst. Corp. Counsel, with whom Herbert O. Reid, Corp. Counsel, and Charles L. Reischel, Washington, D.C., Deputy Corp. Counsel, were on the brief, for respondent.

Before SCHWELB and WAGNER, Associate Judges, and GALLAGHER, Senior Judge.

SCHWELB, Associate Judge:
One man's word is no man's word
We should quietly hear from both sides.
   GOETHE *

## I

## THE CASE

In the early morning hours of December 20, 1988, petitioner Jon W. Eilers was driving his two-seater BMW in a northerly direction on Wisconsin Avenue near Blues Alley in the Georgetown area of northwest Washington, D.C. A female companion, Ms. Lori Shelley, was riding in the passenger seat. At about 12:45 a.m., the vehicle was stopped by Officer Loren Braswell of the Metropolitan Police Department. The circumstances which led to the officer's intervention, as well as the nature of the events that followed, are in sharp dispute. The parties do agree, however, that at the conclusion of the encounter, Mr. Eilers was served with a notice of the proposed suspension of his privilege to operate a motor vehicle in the District of Columbia, allegedly for driving while under the influence of intoxicating liquor and for refusing to submit to two chemical sobriety tests.

On March 20, 1989, the case came before a hearing examiner of the District of Columbia Bureau of Motor Vehicle Services (BMVS). At the conclusion of an evidentiary hearing, the examiner made summary findings unfavorable to Mr. Eilers on both allegations and ordered a one-year revocation of his operating privileges. He issued a brief written order on the same day. On June 6, 1989, without making any additional findings, the Assistant Director of the BMVS affirmed the hearing examiner's decision.

Having filed a timely petition for review, Mr. Eilers now asks this court to set aside the order of revocation on the grounds that he did not receive a fair hearing. He contends, among other things, that the hearing examiner's summary findings lacked adequate support in the record, largely because the testimony of the police officer on which they were based was so contradictory and improbable that it did not constitute credible or substantial evidence. Mr. Eilers also claims that the hearing examiner applied an incorrect legal standard and that he effectively prejudged important contested issues in the case.

We generally defer to factual determinations by the trier of fact. The hearing examiner was present when the witnesses testified. He had the opportunity, never available to a reviewing court, to observe and evaluate their demeanor. We conclude, however, that in this case the police officer's testimony was so flawed that an unexplained decision to accept it was insufficient, and that the hearing examiner was obliged to provide some persuasive reason for crediting it over the evidence of Mr. Eilers and Ms. Shelley. The hearing examiner also expressly decided a significant factual issue in the case before the defense had the opportunity to present any evidence, and subsequently apparently determined the merits before hearing argument. This was inconsistent with the most fundamental elements of fair procedure. Accordingly, we vacate the order of revoca-

* This quotation may be found with the portrait of Honorable Austin Fickling in the Attorneys' Waiting Room outside our courtroom.

tion and remand the case to the BMVS for further proceedings consistent with this opinion.

## II

### THE EVIDENCE

The witnesses at the hearing included the arresting officer, the accused driver and the latter's passenger. Officer Braswell's testimony on "direct" examination by the hearing examiner [1] differed sharply in some respects from the account which he gave on cross-examination, and both versions were contradicted in large measure by Mr. Eilers and Ms. Shelley.

### A. Officer Braswell's Direct Examination.

In response to questions posed by the hearing examiner, Officer Braswell testified that at about 12:45 a.m. on December 20, 1988, he observed Mr. Eilers driving north on Wisconsin Avenue near Blues Alley. He related that the light at that location turned red, but that Mr. Eilers proceeded to drive through it. The officer stopped the car and asked Mr. Eilers to step out. He testified that Mr. Eilers' balance was swaying and unsure and that his eyes were bloodshot and watery. Officer Braswell also stated that he detected a strong odor of alcohol emanating both from the driver's breath and from his vehicle. He gave Mr. Eilers several sobriety "field tests," directing him to walk heel to toe, to turn, and to place his right and left forefingers on his nose. The officer stated that Mr. Eilers failed all of these tests. Accordingly, he was placed under arrest and advised of his rights.

Officer Braswell further testified that he read the entire District of Columbia "implied consent" form to Mr. Eilers. According to the officer, Mr. Eilers had an opportunity to read the form, and he told the officer that he understood it. Officer Braswell testified, however, that Mr. Eilers re-fused to submit to a chemical test, saying only that he did not "feel like taking the test." The officer produced the implied consent form, which was introduced into evidence. The form was signed by Mr. Eilers. Questions 1, 2, and 3, which deal with whether Mr. Eilers' rights had been read to him and whether he understood them, were answered "Yes." The fourth question, "Do you consent to take two chemical tests?" was answered "No." It is not apparent to a lay observer whether these answers were written by the officer or by Mr. Eilers. To the right of the word "No" appears Mr. Eilers' signature. Immediately to the right of his signature there are the hand-printed words "DID NOT FEEL LIKE IT." These words appear to have been inserted after the signature was written, for there is barely enough room for the signature between the word "No" and the hand-printing.

Officer Braswell related that Mr. Eilers was taken to the Traffic Enforcement Branch at 501 New York Avenue, N.W., and that this was where he declined to consent to the tests. Officer Braswell also testified that he completed a Metropolitan Police Department Form 163A (Prosecution Form, DUI) [2] while Mr. Eilers was at that location.

### B. Officer Braswell's Cross-Examination.

During his entire direct examination, the officer never mentioned that he could not see the traffic light which Mr. Eilers allegedly ran, or that Mr. Eilers was assaulting Ms. Shelley at the time, or that the implied consent form was signed in a van at the scene, or that Mr. Eilers was never taken to the Traffic Enforcement Branch at all. During his cross-examination, however, Officer Braswell was led into some startling disclosures regarding each of these subjects.

With respect to the curious saga of the red light, the questioning began as follows:

---

**1.** Officer Braswell was the only representative of the District present. In the absence of an attorney for the District, the hearing examiner propounded the initial questions of the officer. He also briefly interrogated the defense witness-es after Mr. Eilers' counsel had completed his examination of them.

**2.** DUI is short for "driving under the influence" of alcohol or drugs.

Q And did I understand that you said he went through a red light?
A Yes, he did.
Q How did you know it was red?
A How did I know it was red?
Q Uh-huh.
A *Because I could see it perfectly.* It was dark.
Q Yes.
A And I could see that the light was red.

(Emphasis added).

A few moments later, however, the following transpired:

Q Isn't it a fact, though, that the signals at Blues Alley face only northbound traffic?
A No.
Q They face—
A I'm sorry. *Yes, they do.*

(Emphasis added). Following this admission, Officer Braswell abandoned his claim that he could see the traffic light itself, and insisted instead that he could determine that the light was red for cars travelling north because he could see a reflection of it in the window of a toy store, and because the other northbound vehicles had stopped.

Following the revelation that the officer had intervened because of a red light violation when he could not see the light, the officer shifted his emphasis from the traffic signal to a previously undisclosed assault:

At that time when the light changed, he kept going and then he stopped. There was like one or two cars that were stopped. They were obeying the light. He drove up and *what really drew my attention to him is that he was slapping this girl around in his car,* and that was wrong.

**3.** Officer Braswell testified that he asked the passenger if she wished to make a complaint, but that she did not respond.

**4.** There are other aspects of Officer Braswell's testimony that appear problematic to say the least. He related that he stopped Mr. Eilers in a moving lane of traffic near the center lane, and that he then drove the BMW to the curb, apparently leaving the police vehicle unattended. During brief rebuttal testimony, he claimed to

(Emphasis added). Although Officer Braswell had initially testified that he could distinguish the red light and that "it was dark," see page 680, *supra,* he now claimed that he was able to see the assault inside the vehicle, even though no interior lights were on, because "Wisconsin and M is pretty well lit." [3]

Officer Braswell had testified on direct examination that Mr. Eilers was taken to 501 New York Avenue, N.W. for his breathalyzer tests. When first interrogated on the subject on cross-examination, he stated that Ms. Shelley did not accompany Mr. Eilers to the station. He said that he believed that she went home, even though the weather was cold and she was without a coat. He testified that he did not recall what kind of vehicle he was driving on the night in question, or whether he had called for the "alcohol van," which carries all of the necessary chemical testing equipment. As defense counsel pressed him, however, the officer suddenly indicated otherwise:

A Okay.
I'd like to change my statement. It was in the alcohol van.
Q So you had the van?
A Yeah. There it was, yes. I remember now.

*       *       *       *       *       *

A He's arrested and then he comes over to the van.
Q You place them in the van?
A Yes, in the van.
Q And then is it your testimony that you offered him the breathalyzer in the van?
A Yes.[4]

Officer Braswell's revised testimony about the location of the activities was undoubtedly correct; the "Breath Test Re-

have an independent recollection of having moved Mr. Eilers' car. He described the BMW as black; the owner and passenger, who would be expected to know, both said it was white. The officer also testified that he was 200–250 feet from the traffic light when he observed its reflection in the store window, and he said that this was only a quarter of a city block. According to this estimate, a city block is about three football fields long.

sult Ticket" which he issued to Mr. Eilers describes the "location of test" as Cruiser 432. Since the van with the necessary equipment was on the scene, there was no occasion to take Mr. Eilers to 501 New York Avenue, N.W. Officer Braswell acknowledged, however, that he was "totally dependent" on his "notes," [5] which he said were taken in Mr. Eilers' presence at the New York Avenue station.

## C. Mr. Eilers' Testimony.

Mr. Eilers testified that he was working on expense reports at his home in Falls Church, Virginia, at approximately 11:15 p.m. on December 19, 1988 when he received a telephone call from Ms. Shelley, an "on and off" girlfriend. Ms. Shelley told him that she was at an office party at the River Club, which is located at 3223 K Street, N.W. near Wisconsin Avenue and the Potomac River. She asked Mr. Eilers to pick her up because her car was out of commission and because she wanted him to meet her boss and some of her co-workers. Somewhat reluctantly,[6] Mr. Eilers drove to the River Club, where he drank a single beer.[7] They left the club and drove up Wisconsin Avenue. Ms. Shelley was telling him about the party, and they had no argument or physical altercation whatever. Soon, however, Mr. Eilers came behind an automobile which was stopped at a red light. This car remained in place for some time as the light went through its cycle. He eventually drove around the stationary vehicle while the light was flashing yellow.

According to Mr. Eilers, it was at this point that Officer Braswell pulled up next to him, asked him to roll down his window, and asked why he had gone through the [red] light. Mr. Eilers denied that he had

done so and explained what had happened. He testified that the officer told him to pull over to the side of the road. After Mr. Eilers parked and stepped out of the car, the officer asked him if he had had anything to drink. Mr. Eilers responded that he had had one beer.

Mr. Eilers admitted that he declined to take one breathalyzer test, but his account of the circumstances differed sharply from Officer Braswell's. He stated that after the inquiry regarding how much Mr. Eilers had had to drink, the officer stepped into the van and brought out a handheld "RBT," or "roadside breath test." According to Mr. Eilers, the officer was "rubbing" the device and placed it in front of the headlight. Mr. Eilers testified that

> I asked to take another breathalyzer and he wouldn't give me another breathalyzer.[8] The reason I didn't take the one breathalyzer is that a breathalyzer runs on infrared. I've got a Bachelor of Science degree in mechanical engineering and electrical engineering. And in rubbing it, if you're breathing in and ethanol is going to be registering, the infrared is based on heat.[9]

Mr. Eilers agreed that the officer had given him some field sobriety tests, but he claimed that he had performed them all successfully. He also testified that this was a cold December night, that Ms. Shelley's coat had been locked in the car, and that she was pounding on the window of the van and requesting a chance to get her coat while he was being processed. According to Mr. Eilers, the officer told him that "I should tell the girl to quit yelling through the window and making a scene or she was going to jail too."

---

**5.** Presumably, he was referring to Form MPD 163A.

**6.** "I did not want to pick up Lori to begin with, nor did I want to come out at that time of the night."

**7.** Mr. Eilers denied that he had consumed any alcohol earlier that evening. He was apparently annoyed because the beer cost $4.95.

**8.** Mr. Eilers insisted that he asked on four occasions to take a breathalyzer test inside the van, but that Officer Braswell told him that "you

blew your chance." He also claimed that Officer Braswell told him he would go to jail if the test came up "positive" but that he would be processed and released if he declined to take it.

**9.** The government acknowledges in its brief that evidence of blood alcohol based on such roadside tests is insufficiently reliable for use in court, and that these tests can be influenced by weather conditions.

Mr. Eilers stated that he signed the implied consent form without reading all of it,[10] and that the words "DID NOT FEEL LIKE IT," as well as the answers to the questions, were not filled in when he affixed his signature. He testified that he was not taken to 501 New York Avenue, N.W. at all, but released from the van. He was warned by Officer Braswell that he would be arrested if he attempted to drive his car. For that reason, he gave the keys to Ms. Shelley, who then drove home.

### D. Ms. Shelley's Testimony.

Ms. Shelley, a sales representative for Wang Laboratories, substantially corroborated Mr. Eilers' account of the events of the night of the arrest. She confirmed that Mr. Eilers drank only a single beer at the River Club.[11] She testified that following their departure, Mr. Eilers stopped at a traffic signal behind a car that did not move for a minute or two. Since that vehicle remained in place, Mr. Eilers proceeded to drive around it. Ms. Shelley categorically denied that there was any disagreement, argument, slapping, pushing, or other commotion in the car, or that the officer had ever asked her about any such activity. She confirmed that after Officer Braswell pulled them over, it was Mr. Eilers, not the officer, who parked the BMW at the curb.

Ms. Shelley observed Mr. Eilers while he was taking a number of the roadside tests. She described his performance as "perfectly fine." He did not sway, wobble or lose his balance, and he was steady on his feet. She stated that she had no concern about her safety while Mr. Eilers was driving. Ms. Shelley also confirmed that the officer was rubbing the RBT, and that Mr. Eilers was complaining about this activity and refusing to take the test on the RBT for that reason. She stated that Mr. Eilers asked for the opportunity to take a test on another breathalyzer but was refused by Officer Braswell. Ms. Shelley further tes-

tified that she heard the officer tell Mr. Eilers that he would "go to jail" if the test on the RBT turned out positive.

While Mr. Eilers was being processed in the van, Ms. Shelley, who was wearing a cocktail dress, was outside in the street, "freezing and crying." When she asked Officer Braswell for her coat, "he told me if I continued to harass him, that I could go to jail in addition to Jon's going to jail." Someone eventually put a coat over her shoulders. After Mr. Eilers was released, the officer told him that "if you get in that car and drive, you'll go to jail." Accordingly, she drove the two of them home. Neither she nor Mr. Eilers ever went to the police station.

### III

### THE HEARING EXAMINER'S RULINGS

During the cross-examination of Officer Braswell, defense counsel asked a somewhat argumentative question regarding whether the officer "always stop[ped] people in cars assuming they are having a tiff back and forth at each other?" Before the officer could respond, the hearing examiner interceded:

> Counsel, if I may, I don't think that's a germane question. I know you're trying to establish [sic] reasonable cause for the officer to initiate a traffic stop. *I am convinced Officer Braswell did observe Mr. Eilers commit a traffic violation at the red light.*

(Emphasis added). At the time the examiner made this remark, neither Mr. Eilers nor Ms. Shelley had testified.

After all of the testimony had been presented, but before closing argument, the hearing examiner asked Mr. Eilers' counsel whether he had "anything *in mitigation.*" After hearing argument from the defense attorney, the hearing examiner delivered his oral decision, which we reproduce in its entirety, as follows:

---

**10.** The District reasonably argues that this testimony was not persuasive. One might expect a college graduate who has been pleading with an officer to allow him to take a reliable breathalyzer test not to sign without reading a form which asks "Do you consent to take two chemi-

cal tests?" without first ensuring that the word "yes" is written in as the answer.

**11.** Ms. Shelley testified that she does not drink at all.

Gentlemen, ladies, having heard all of the testimony, I do credit Officer Braswell's testimony in making my following findings of fact. Mr. Eilers, (1), that you did operate a motor vehicle on or about December 20, 1988, at or near the 1000 block of Wisconsin Avenue, Northwest, Washington, D.C., at approximately 12:45 a.m.; (2) That you did at such time and place fail several field sobriety tests after the tests had been properly demonstrated; your speech was slurred and mumbled, your balance was unsure; by your own sworn testimony, you had consumed at least one beer; you were advised of your Miranda rights; (3) That you did at such time and such place operate a motor vehicle while under the influence of intoxicating liquor.

My conclusion of law is (a) On or about December 20, 1988, at or near the 1000 block of Wisconsin Avenue, Northwest, Washington, D.C., you did operate a motor vehicle in such a manner as to show flagrant disregard for the safety of persons or property, in that you did operate a motor vehicle while under the influence of intoxicating liquor under authority of Section 302.5 of Title 18, District of Columbia Municipal Regulations; and (b) On or about December 20, 1988, you did, after being properly requested by an officer of the law, refuse to submit to two chemical tests of your breath, blood or urine to determine the alcohol content thereof as is required by D.C. Law 4–145.[12]

The examiner added that "it is my decision to issue a 12–month revocation without stay."

On June 8, 1989, the Assistant Director of BMVS sustained the hearing examiner's order by checking a box entitled "Affirmed." °

## IV

### LEGAL DISCUSSION

A. General Principles.

A license revocation proceeding is a contested case governed by the District of Columbia Administrative Procedure Act (DCAPA). D.C.Code §§ 1–1501 to 1511 (1987 & 1990 Supp.). A person aggrieved by a final order of the mayor revoking his license may obtain review in this court pursuant to the Act. D.C.Code § 40–507 (1990). Under the DCAPA, the agency's findings must be supported by reliable, probative and substantial evidence, D.C.Code § 1–1509(e) (1987), and its conclusions of law must flow rationally from these findings. *Perkins v. District of Columbia Dep't of Employment Svcs.*, 482 A.2d 401, 402 (D.C.1984). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *King v. District of Columbia Dep't of Employment Svcs.*, 560 A.2d 1067, 1072 (D.C.1989) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

It cannot plausibly be gainsaid that if Officer Braswell's testimony was worthy of belief—if it constituted "reliable, probative and substantial evidence"—then there was ample basis in the record to support the revocation of Mr. Eilers' driving privileges. The officer testified that Mr. Eilers reeked of alcohol, that his eyes were bloodshot and that he failed a number of roadside sobriety tests; this alone was sufficient to sustain the sanction imposed. D.C. Code § 40–716(d)(1) (1990). The hearing examiner also received into evidence an implied consent form signed by Mr. Eilers in which he had apparently stated his unwillingness to submit to two chemical tests of his blood-alcohol content. The Mayor is required, in cases of such refusal, to revoke his license for a period of twelve months. D.C.Code § 40–505(a) (1990).

■ Mr. Eilers' first response to these hard realities is to remind us that the District has the burden of proof with respect to the alleged violations. *See* D.C.Code § 1–1509(b) (1987); *Allen v. District of Columbia Rental Hous. Comm'n*, 538 A.2d

12. Apparently, the "conclusion of law" about Mr. Eilers' alleged refusal to submit to two chemical tests was intended to be a "finding of fact."

752, 754 (D.C.1988). He contends that the District was not required to prove its case. The hearing examiner did not specify in his oral or written decision which party had the burden of persuasion, and one might perhaps plausibly infer from the state of the record and from the problems with Officer Braswell's testimony that if the burden was placed on the District, it was not a very substantial one. Nevertheless, a presumption of regularity attaches to the official actions of public officers. E. CLEARY, McCORMICK ON EVIDENCE § 343, at 969 (3d ed. 1984). In the absence of firm evidence that the hearing examiner believed that Mr. Eilers had the burden of proof, we are unwilling to assume that the proceedings were conducted under so fundamental a misapprehension. We conclude that Mr. Eilers has failed to establish that the hearing examiner incorrectly assigned the burden of proof.

In a typical scenario, our conclusion that the officer's testimony on its face supports the examiner's finding as to Mr. Eilers' insobriety and refusal to take two chemical tests would all but end the inquiry. Mr. Eilers contends, however, that the present case is extraordinary rather than typical. He claims that the testimony of the police officer was so profoundly flawed that it did not constitute probative, reliable and substantial evidence within the meaning of the DCAPA. He also maintains that the hearing examiner's conclusory findings were insufficient under the circumstances, and that his decision was further compromised by his apparent prejudgment of significant issues which he was called upon to decide.

B. Credibility Problems and the Sufficiency of the Findings.

■ In general, credibility findings by a trier of fact who has had the opportunity to observe the witnesses and assess their demeanor are accorded considerable deference by reviewing courts. "[A]n appellate court lacks the direct "feel" for the evidence which is available to the [hearing examiner], who sees live bodies and facial expressions rather than a cold transcript which may capture words while the heart and soul of the case elude it." *In re T.M.,* 577 A.2d 1149, 1154 (D.C.1990). Moreover, although articulation of reasons is to be encouraged, *Harris v. District of Columbia Comm'n on Human Rights,* 562 A.2d 625, 631 (D.C.1989),[13] the hearing examiner is not ordinarily required to explain why he believed one witness over another. *Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n,* 402 A.2d 36, 47 (D.C.1979); *see also Harris, supra,* 562 A.2d at 631. As this court explained in *Citizens Ass'n, supra,* 402 A.2d at 47 n. 19, however,

> [i]t is conceivable ... that the evidence in support of a finding could be so weak, in contrast with evidence to the contrary, that an agency—to avoid a remand—would have to give persuasive reasons for its reliance on particular testimony, otherwise, the evidence could not be deemed "reliable, probative, and substantial." DCAPA § 1–1509(e).

The court added its agreement with the proposition that

> there may be certain basic findings of fact on contested issues which are so thinly supported by evidence of record that still other findings would be required to demonstrate that there is 'reliable, probative, and substantial' evidence to support them.

*Id.* at n. 20.[14] We think that this is a case of the kind envisaged in *Citizens Ass'n.*

We recognize that "[a] certain amount of inconsistency in the evidence is almost inevitable in any trial, but it rarely justifies reversal," at least where the degree of inconsistency is not "abnormal". *In re A.H.B.,* 491 A.2d 490, 495 (D.C.1985). The discrepancies in the present case, however, are not of the commonplace variety. Officer Braswell claimed initially to have ob-

---

13. "It would have been helpful if the hearing examiner had explained whether his credibility findings were predicated in any measure [on] the demeanor of [respondent's] witnesses." *Id.* at 631.

14. The court viewed this as a correct interpretation of language in *Shay v. District of Columbia Board of Zoning Adjustment,* 334 A.2d 175 (D.C. 1975).

served Mr. Eilers drive through a red light; he later acknowledged that the light could not be seen from his (the officer's) vantage point. When this problem emerged with the officer's version of events, he referred for the first time to an alleged assault by the driver on the passenger, and he now described this assault as his real reason for stopping Mr. Eilers' vehicle. The officer claimed to have left his police vehicle unattended in the middle of the street as he moved Mr. Eilers' BMW to the curb. He testified in some detail about events that he described as having occurred at a police station, but he subsequently acknowledged that Mr. Eilers was never taken to the police station at all.[15]

The limitations of "cold" transcripts notwithstanding, reviewing courts are not absolutely bound by the credibility findings of administrative officers or agencies. "Although the ALJ generally is upheld on credibility determinations, there are certain times when a court must override such a determination by examining evidence in the record that detracts from the ALJ's finding." *First Nat'l Bank of Bellaire v. Comptroller of the Currency*, 697 F.2d 674, 687 (5th Cir.1983). As the court stated in *Midwest Stock Exch., Inc. v. NLRB*, 635 F.2d 1255, 1265 (7th Cir.1980),

> [t]he ALJ has an opportunity to hear the testimony and view the witnesses and, therefore, is best suited to make credibility determinations.... On the other hand, we may also disregard these credibility determinations where we find them to be unreasonable, self-contradictory or based on inadequate reasoning.

(Citations omitted).

A reviewing court must scrutinize the record as a whole and, although "it is not our task to assess the facts of this case *de novo*, neither [are we] to function as a 'judicial echo' or rubber stamp for the conclusions of the [agency]." *Id.* at 1259, (quoting in part *Universal Camera Corp.*

*v. NLRB*, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951)); *see also Krispy Kreme Doughnut Corp. v. NLRB*, 732 F.2d 1288, 1290 (6th Cir.1984). In light of the unusual problems with Officer Braswell's testimony, we think that this is a case in which the hearing examiner should have offered a specific, cogent reason for crediting it and for rejecting the contrary evidence offered by Mr. Eilers and his witness. *Cf. Vilorio–Lopez v. INS*, 852 F.2d 1137, 1141 (9th Cir.1988).

But the hearing examiner offered no reasons, cogent or otherwise, for his credibility determinations. Indeed, his findings in this case, both oral and written, were altogether conclusory. Although the record is devoid of evidence of reckless driving on the part of Mr. Eilers—the nearest approximation is the testimony of the officer that Mr. Eilers drove through a red light which the officer was unable to see—the examiner found that Mr. Eilers operated his vehicle "in such a manner as to show a flagrant disregard for the safety of persons or property." This is a verbatim rendition of a passage from *Bungardeanu v. England*, 219 A.2d 104, 108 (D.C.1966), in which the charges against the driver included reckless driving, three counts of leaving the scene of an accident, and DUI.[16] The borrowed phraseology from *Bungardeanu* suggests the rote recitation of language from precedents of dubious relevance rather than a meaningful attempt to come to grips with the difficult factual issues raised by this record. In a case dominated by credibility problems, this simply will not do.

With respect to the issue whether Mr. Eilers operated his vehicle under the influence of alcohol, one can reasonably deduce that the hearing examiner credited Officer Braswell over Mr. Eilers and Ms. Shelley. He stated that he believed the officer, and there were relatively specific findings regarding the smell of alcohol, Mr. Eilers'

---

**15.** Officer Braswell conceded that he had little or no personal recollection of what took place on the day of the arrest, and he relied heavily on his paper work. Ironically, he said he prepared the paper work at the police station, with Mr. Eilers present, an assertion which was un-

dermined by his subsequent acknowledgment that the events took place in the van.

**16.** Mr. Bungardeanu's urine specimen contained .25% alcohol.

bloodshot eyes, his wobbly gait, and the allegedly failed sobriety tests. In essentially paraphrasing the officer's observations, however,[17] the examiner made no mention, of any of the facts which tended to cast doubt on the officer's credibility. Except for his premature pronouncement, before the defense case began, that he was sure that there was a traffic violation at the red light, see page 682, *supra*, the hearing examiner made no finding as to the red light controversy. He likewise never addressed Officer Braswell's claim that Mr. Eilers had assaulted Ms. Shelley, or the unusual fact that this assault was never mentioned until after the revelation that the officer could not have seen the red light through which he claimed that Mr. Eilers had driven. Although these issues were arguably collateral in a technical sense in that the District was not required to prove either a red light violation or an assault, we think that they were central to a determination as to who was telling the truth about the incident and who had the superior recollection. In a case in which credibility was the critical issue, no reasonable determination as to whether the officer's testimony constituted probative and reliable evidence within the meaning of the DCAPA could be made without these discrepancies being addressed.

The findings are even more defective, in our view, in regard to Mr. Eilers' alleged refusal to take the two chemical tests. Aside from issues of credibility, the hearing examiner made no finding as to whether the controversy over the officer's rubbing the RBT occurred. He likewise did not address the question whether Mr. Eilers requested that he be tested on a more reliable machine. Finally, there was no finding as to whether and to what extent the implied consent form had been filled out at the time Mr. Eilers signed it. See pages 679–680, *supra*. If the officer wrote in portions of it after obtaining Mr. Eilers' signature—and this seems to us a more than plausible possibility in view of the location of the hand-printed words "DID

NOT FEEL LIKE IT" to the immediate right of the signature—then this would have a significant bearing on the credibility issues. *Cf.* II J. WIGMORE, EVIDENCE § 278, at 133–34 (Chadbourn ed. 1979).

As we stated in *Dietrich v. District of Columbia Board of Zoning Adjustment*, 293 A.2d 470, 473 (D.C.1972),

> [t]he function of the court in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues. The court can only perform this function when the agency discloses the basis of its order by an articulation with reasonable clarity of its reasons for the decision.

*Accord, Communications Workers of America v. District of Columbia Comm'n on Human Rights*, 367 A.2d 149, 152 (D.C. 1976). Neither the repetition of the statutory language (or of language from a decided case) nor a summary of the evidence of the witness credited by the agency satisfies the requirements of the Act, *Hedgman v. District of Columbia Hackers' License Appeal Bd.*, 549 A.2d 720, 723 (D.C.1988), especially where, as here, critical questions remain as to how the events occurred and as to whether the officer's testimony was reliable and probative. We simply cannot say, on this record, that the "agency has given full and reasoned consideration to all material facts and issues." *Dietrich, supra*, 293 A.2d at 473. "The only role for a court is to insure that the agency has taken a hard look." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). In this case, we are not at all confident that the agency has done so.

**C. Prejudgment of Contested Issues.**

The conclusory character of the hearing examiner's findings and the credibility problems of the officer on whose testimony they were based are, in our view, sufficient without more to require us to vacate the order revoking Mr. Eilers' license. The

---

**17.** The examiner did add in his oral finding that Mr. Eilers had admitted drinking at least one beer. In fact, Mr. Eilers specified that one beer, not "at least" one beer, was all that he had, explaining that beer was very expensive at the River Club.

need for such action on our part is even more pronounced, however, in light of the hearing examiner's apparent prejudgment of important contested issues in the case.

As we have noted at page 682, *supra,* the hearing examiner remarked during the cross-examination of Officer Braswell that he was "convinced" that Mr. Eilers had committed a traffic violation at the red light. At the time when he made this remark, Mr. Eilers and Ms. Shelley had not yet testified. The conclusion is inescapable that the hearing examiner made a determination which seriously damaged Mr. Eilers' position after having heard from the District, but without Mr. Eilers having been accorded an opportunity to be heard.

It is, of course, fundamental that a trier of fact may not decide any question before hearing all of the evidence. Juries are routinely instructed that

> [i]t is important that you keep an open mind and not decide any issue in the case[18] until the entire case has been submitted to you with my final instructions.

CRIMINAL JURY INSTRUCTIONS OF THE DISTRICT OF COLUMBIA, No. 1.02, at 7 (3d ed. 1978). A decision against a litigant which has been reached after hearing only a part of his evidence rests upon "an egregiously erroneous foundation." *Fong Foo v. United States,* 369 U.S. 141, 143, 82 S.Ct. 671, 672, 7 L.Ed.2d 629 (1962) (per curiam). Indeed, Professor Davis has suggested that the basic credo of democratic governments (as distinguished from authoritarian regimes) in regard to administrative decision-making is:

> Be sure you give the affected party a chance to meet the evidence against his interest and a chance to present an argument on questions of law and policy.

2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 10:4, at 317 (2d ed. 1979).

In the present case, the examiner had not heard *any* of Mr. Eilers' evidence when he announced that he was convinced that Mr. Eilers had committed a traffic violation. Moreover, the issue which was so prematurely resolved was of central importance to the case, for it went to the officer's credibility with regard to whether there was any basis for stopping Mr. Eilers at all. If a trier of fact were to conclude that the officer was lying on that subject, or even mistaken with regard to it, a substantial cloud would surely hang over his testimony with respect to events which occurred immediately after the stop.

Later in the proceeding, the hearing examiner compounded his evident prejudgment of one issue with what appeared to be a premature resolution of the entire case. After all of the evidence had been received, but before counsel for Mr. Eilers had begun his closing argument, the hearing examiner asked him if he had anything "in mitigation." "Mitigation" is defined as "alleviation, reduction, abatement or diminution of a penalty or punishment imposed by law." BLACK'S LAW DICTIONARY 904 (5th ed. 1979).[19] In other words, before hearing argument with respect to whether or not the District had proved its case, the hearing examiner invited the kind of plea for leniency which is generally made on behalf of a party who has already been determined to have transgressed. After counsel presented his argument on the merits, the hearing examiner announced his decision, which included the sanction, without any comment whatever regarding counsel's contention that the District had not proved its case.

Under other circumstances, and considering the presumption of regularity, see page 683, *supra,* we might well be disposed to assume that the examiner did not intend his remarks about the violation at the red light to mean what they appear to mean.

---

**18.** The District contends that Mr. Eilers was not on trial for running through a red light, and that the premature decision therefore related to a collateral issue. As the quoted jury instruction discloses, however, the trier of fact may not decide *any* issue before the case has been presented in its entirety. See also text at page 686–687, *infra.*

**19.** The word has meant the same thing for a long time. *See* 2 BOUVIER'S LAW DICTIONARY 2234 (8th ed. 1914) ("reduction; diminution; lessening of the amount of a penalty or punishment").

Similarly, the inquiry about "mitigation," if it stood alone in the record, could simply be explained as a poor choice of words. Unfortunately, however, these comments did not represent an aberration from the examiner's overall approach to the case. On the contrary, they were entirely consistent with it. What the examiner said conformed to what he did. An objective, disinterested observer fully informed of these facts would surely entertain significant doubt that Mr. Eilers received a fair hearing. *Cf. Pepsico, Inc. v. McMillen,* 764 F.2d 458, 460 (7th Cir.1985). Under these circumstances, the action of the agency cannot stand.

D. The Remedy.

■ Mr. Eilers asks that we order the agency to restore his driving privileges. The District urges us, in the event we view the hearing examiner's findings to be insufficient, to remand the case to the agency for additional findings. Despite some concern that, as a result of the passage of time, anything short of immediate restoration of the license may be inequitable to Mr. Eilers, we are constrained to conclude that a remand which authorizes further proceedings is the appropriate remedy.

In spite of the severe problems, not easily overcome, which we have found with Officer Braswell's testimony, this is not a case in which a reasonable trier of fact who has addressed all of the relevant issues could reach only one conclusion. In a conventional civil proceeding, this would not be a case in which a judge, viewing the facts in the light most favorable to the District, *see District of Columbia v. Bethel,* 567 A.2d 1331, 1334 (D.C.1990), could reasonably grant a directed verdict.

A practical problem which this situation presents is that the period of one year for which Mr. Eilers' driving privileges were revoked has long elapsed. Justice delayed is often justice denied. In *Hedgman,* in which the petitioner's hacker's license had been revoked for a year following similarly flawed administrative proceedings, we observed that

[o]rdinarily, an administrative decision defective in these respects would be remanded to the agency for additional findings and conclusions. Such a remand here would be academic as the period of suspension had expired by the time the case reached us on the calendar.

549 A.2d at 723 n. 2.[20] Mr. Eilers argues that the same principle applies here.

The District invites our attention, however, to 18 DCMR § 306.7 (1987), which provides that

[t]he Director shall not ... restore the operating privilege of any nonresident whose license has been revoked unless and until he or she is satisfied, after investigation of the driving ability of that person, that it will be safe to grant the privilege of driving a motor vehicle.

We take this provision to mean that if Mr. Eilers' conduct in December 1988 warranted revocation of his operating privilege for a year, then the expiration of that year would make him eligible to re-apply for his license, but would not automatically result in his receiving it. No comparable provision was at issue or invoked by the District in *Hedgman.*

Under these circumstances, we think that the District, should it elect not to let sleeping dogs lie,[21] has the right to a determination, to be made following proceedings consistent in all respect with the requirements of the DCAPA, whether the 1988 incident warranted revocation of Mr. Eilers' driving privileges. We note that counsel represented at the hearing that Mr. Eilers had no prior alcohol-related record whatever. If that is so, then in light of the period of time during which Mr. Eilers has been precluded from driving in the District, the

---

**20.** In *Hedgman,* we nevertheless sustained a portion of the agency's order which conditioned restoration of the petitioner's privileges on a showing that he was medically fit to operate a public service vehicle. This condition was imposed as a result of *Hedgman's* possible emotional problems.

**21.** "Surely the milk of human kindness may permissibly flow on occasion within coldly impersonal [agency] office walls." *Bledsoe v. District of Columbia Dep't of Employment Svcs.,* 544 A.2d 723, 725 n. 6 (D.C.1988).

agency may conclude that the punishment has already been sufficient to fit the crime,[22] and that no further proceedings are required. That is a determination, however, which must be made by the agency rather than by the court, *cf. Swisher v. United States,* 572 A.2d 85, 94 n. 25 (D.C. 1990) (per curiam), with due regard for the purpose of our statute, which is not to punish alleged violators but to protect the community from those who have demonstrated that their driving is a hazard to life and property. *Bungardeanu, supra,* 219 A.2d at 107.

In the event that the agency determines that a new hearing is appropriate, we think it best under all of the circumstances that a different hearing examiner preside.[23]

## V

## CONCLUSION

For the foregoing reasons, the order of the BMVS is vacated, and the case is remanded for further proceedings consistent with this opinion.[24]

*So ordered.*

---

**22.** We use the Mikado's famous phrase in a colloquial rather than a technical sense.

**23.** If further proceedings are pursued, the agency should determine, in light of our disposition of this case and its own regulations, whether Mr. Eilers' driving privileges should be restored pending a new hearing.

**24.** In the event of a new hearing, the District shall be required to prove its case by a preponderance of the evidence. *Atkinson v. Parsekian,* 37 N.J. 143, 148, 179 A.2d 732, 735 (1962); *Commonwealth v. Royer,* 213 Pa.Super. 17, 21, 245 A.2d 716, 718 (1968); *see also* 60 C.J.S. *Motor Vehicles* § 164.30, at 888 n. 26 (1969 & Supp. 1990) and authorities there cited.