PRO–FOOTBALL, INC., d/b/a Washington Redskins, and Reliance National Insurance Company, Petitioners,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent, and Richard G. Graf, Intervenor.

No. 98–AA–845.

District of Columbia Court of Appeals.

Argued Dec. 3, 1999.

Decided Oct. 4, 2001.

Brian S. Harvey and Marc A. Antonetti, Washington, DC, for petitioners.

Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel filed a statement in lieu of brief, for respondent.

Alan D. Sundburg, Washington, DC, for intervenor.

Before WAGNER, Chief Judge, and REID and GLICKMAN, Associate Judges.

WAGNER, Chief Judge:

Petitioners, Pro–Football, Inc. (d/b/a Washington Redskins) and Reliance National Insurance Company (collectively referred to as employer), appeal from a decision of the Department of Employment Services (DOES) awarding disability benefits to intervenor, Richard G. Graf. While employed as a football player with the Washington Redskins, Graf was injured during a pre-season game. Graf filed a claim for benefits under the provisions of the District of Columbia Workers' Compensation Act of 1979, D.C.Code §§ 36–301 *et seq.* (1991) (Act). After a hearing, a compensation order was entered awarding Graf both temporary total and permanent partial disability benefits. The employer argues for reversal of the compensation order on the grounds that:(1) the decision was not based on substantial evidence in the record as a whole; (2) the hearing examiner failed to accord proper weight to the opinions of Graf's treating physician; (3) the hearing examiner failed to resolve issues concerning the factual basis for the

expert's opinion; and (4) Graf failed to sustain his burden of proving that he suffered a career-ending injury. We conclude that the hearing examiner failed to explain his reasons for rejecting the opinion of the treating physician over that of a non-treating physician, and therefore, a remand is required under our case law. We also conclude that, upon remand, the hearing examiner must address explicitly the employer's claim that Graf was terminated for reasons other than a work-related injury and the impact, if any, of the limited projected work-life for one in Graf's profession at the time of injury upon a determination of wage loss under the Act.

## I.

### A. *Factual Background*

Graf, a defensive linebacker with the Redskins, sustained an injury to his neck and right arm during a pre-season game against the Pittsburgh Steelers on August 26, 1994. While still on the sideline, Graf reported his condition to his team's physician, Dr. Charles Jackson, an orthopedic surgeon. The parties stipulated that Graf sustained an accidental injury at that time, but they disagreed as to the nature and extent of the injury and whether it precluded Graf from continuing his career as a professional football player. The employer challenges on appeal the sufficiency of the evidence supporting the compensation order and the adequacy of the agency's rationale for rejecting the opinion of Graf's treating physician and for accepting the opinion of a non-treating physician in rendering the decision. Therefore, we outline in some detail the evidence related to these issues.

Dr. Jackson testified that

[a]t the time of injury, [Graf] had pain not only in his neck, but he had pain radiating from his neck down into his shoulder and down into the deltoid part of his arm, which is the muscle that sets out on the side of the shoulder.

He testified that the injury was more substantial than a burner, a transient episode. Dr. Jackson reviewed x-rays taken a few days after the injury and found that they were negative for fractures. Although Dr. Jackson did not think that Graf had sustained a career-ending injury at that time, he thought that Graf should stop playing football temporarily. Dr. Jackson diagnosed radiculitis, which he explained referred to nerve root irritation. Within a few days, a Magnetic Resonance Imaging (MRI) was obtained through Dr. John A. Long. Dr. Long concluded that "there was osteophyte and disk material encroaching the C5–6 right foramen, and there was shallow disk herniation in the C6–7 right foramen." It was Dr. Jackson's opinion that Graf had a bulging disk, as opposed to a herniated disk, for which surgical intervention would not be required.[1] Dr. Jackson stated that his interpretation of disk bulging was exactly the same as Dr. Long's, but they stated it differently.

Between August and November 17, 1994, Dr. Jackson treated Graf for his injuries, with a conservative approach consisting of cortisone to shrink the nerve and alleviate the pain, muscle relaxants, physical therapy and pain medication. On August 30, 1994, he prescribed a very strong drug, percocet, which he said he would not have done if Graf were not experiencing severe pain. According to Dr. Jackson, Graf continued to have considerable pain in the neck radiating into the deltoid area of the arm, which is indicative that the nerve has irritation. The arm pain re-

---

1. Dr. Jackson explained that it was a question of degree and that he referred to a bulge to the point where surgery would be required as a herniated disk.

solved almost completely, but Graf continued to have distressing symptoms of the neck. At that time, Dr. Jackson felt that there was a very good chance that this symptom would resolve. For the post-season physical on December 21, 1994, Dr. Jackson reported that Graf "had not completely recovered from his neck injury" and that "[h]e still had restriction of motion, particularly lateral bending of his neck."

Dr. Frederick C. Kriss, a neurosurgeon, examined Graf on September 5, 1995. He also reviewed his medical records, including Dr. Jackson's notes, the physical therapist's notes, the MRI scan and notes from Dr. Steven Blood, a doctor of osteopathy. At that time, Dr. Kriss noted that Graf's symptoms had greatly improved and that Graf no longer had numbness and pain down the arm, although he experienced shoulder pain when throwing a ball. Graf also experienced neck spasms lasting four to five days, three to four times over the year. Dr. Kriss found that Graf had two ruptured disks in the neck (i.e., moderate sized tears in the cartilage), which correlated to his physical symptoms and x-rays. He testified that the symptoms down the arm and shoulder were related primarily to the pressure and irritation on the specific nerve roots. He testified that the disc tears at the C5–6 and C6–7 bulged into the space around the spinal cord. Based on the MRI, he made a diagnosis of cervical stenosis, which he explained is a narrowing of the spinal canal, leaving a minimal margin around the spinal cord. Dr. Kriss testified that he was of the opinion that: (1) the injury Graf sustained on August 26, 1994 caused his disc herniations and the risk of potential injury from stenosis; (2)

Graf reached a plateau after receiving standard treatment, and he did not think anything would change; (3) Graf is disabled and it would be dangerous for him to play professional football, with its battering ram style, because he is particularly vulnerable to spinal cord injury due to the narrowing; (4) if Graf plays football, he would get numbness, tingling and aching, and further treatment, other than an operation, would not help.

Dr. Jackson testified that he referred Graf to Dr. Joseph Torg because Dr. Kriss expressed concern that Graf had spinal stenosis.[2] Dr. Torg, a neurosurgeon and an expert in sports medicine, testified that Graf had an injury, but it had resolved by the time that he saw him. He reviewed Graf's medical records and performed a routine examination of the cervical spine. When he examined Graf, Dr. Torg found no evidence of neck stiffness or limitation of motion and no reproducible neurologic findings. He reviewed the MRI film and report and thought that "there was a mild bulging of the intervertebral discs at C5–6 and C6–7 and that basically the study was otherwise normal." He thought that the spinal cord had plenty of room in the spinal canal. From reviewing the MRI, he concluded that Graf never had cervical spinal stenosis or an episode of cord neuropraxia. Dr. Torg testified that Graf had two soft disc bulges, not herniations, and disagreed with Dr. Kriss in that respect. He also disagreed strongly with Dr. Kriss that further trauma to Graf's cervical spine could result in permanent quadroparesis or central cord syndrome. He opined that Graf had abnormalities in his cervical spine which were acutely exacerbated when he sustained the injury. According

2. Dr. Jackson described spinal stenosis this way:

[b]asically, the amount of room that there is in the canal—the bony canal in which the

spinal cord sets—is at question. If that room is significantly lost or narrowed, we would call that spinal stenosis.

to Dr. Torg, except for limited cervical motion noted two times immediately after the injury, Graf's objective physical and neurologic findings were essentially normal. In Dr. Torg's opinion, Graf has no greater risk of permanent neurological injury than any other participant in the National Football League.

The treating physician, Dr. Jackson, testified that he agreed *essentially* with Dr. Torg that: (1) Graf's objective physical and neurological findings were essentially normal, except for limited cervical motion noted two times following the injury; and (2) Graf was at no greater risk of permanent neurological injury than any other National Football League player. He disagreed with Dr. Kriss that Graf has acquired cervical stenosis. He explained that he differs with Dr. Kriss on the amount of room necessary in the spinal canal in order to play professional football. In response to a question concerning whether the MRI report indicated that Graf had acquired cervical stenosis, Dr. Jackson responded "[t]here is some narrowing, but I felt there was very ample room of the spinal cord and the surrounding tissues that he was not at risk from ... any imminent danger from injury because of this." When asked whether there was any reason that Graf could not play professional football due to the injury in his neck, Dr. Jackson responded that he had not examined him since November 1994, but he did not think so at the time. Dr. Jackson added

> [o]bviously, if he continues with symptoms about his neck or symptoms of radiating pain into his arm, then he should not continue to play professional football, but I did not feel that that was the case at that time, and that he would recover from this, was my impression at that time.

Graf testified in his own behalf. He testified that the injury occurred when he was hit in the head during a tackle. He testified that after he was injured, he had pain down both arms into his hand, weakness, numbness and pain in the neck. He testified that the employer never took him off the injured reserve list during the remainder of his contract, which expired in 1995. At the time of the hearing, he testified that he still had pain in his right arm and hand, which can be brought on by moving his neck. He said that any type of throwing hurts his neck and that sometimes his symptoms persist for five to seven days. He testified to the specific physical requirements and heavy contact involved in playing professional football.

Graf remained physically unable to play football and remained on the injured reserve list until his contract with Pro Football, Inc. expired on February 28, 1995. Graf received his full contract salary, but was not offered continued employment, and he did not receive offers of employment from other professional football teams. On July 8, 1995, Graf obtained employment in the sales division of a health and fitness center earning a base salary of $24,000.[3] Graf was thirty-one years old at the time of the injury. While Graf earned an undergraduate degree in communications, he had worked only as a professional football player prior to July 8, 1995.

### B. *Compensation Order*

The hearing and appeals examiner found, consistent with the parties' stipulation, that Graf sustained an accidental injury in the course of his employment on August 26, 1994. Specifically, he found that Graf was injured when he "rushed head first into an opposing team member

---

**3.** Prior to this position, Graf had earned no wages from the date his contract expired.

during a tackle." The examiner further found that the MRI scan showed that Graf had "disc herniation at C6–7 encroaching the right nerve opening, disc bulging at C5–6 encroaching the right nerve root canal, and traumatically induced narrowing (stenosis) of the cervical spinal canal at C5–6 and C6–7." As a result of the accident, the examiner found that Graf experienced neck pain "caused by inflamed nerves in [his] cervical spine impinging upon the fragmented inner surface of the damaged cervical discs...." In the findings, the examiner stated that Graf remained physically incapable of playing football, that he was placed on the injured reserve list and that Dr. Jackson did not recommend his removal from that status when he performed his year-end physical. The examiner found that Graf had continuing symptoms of neck pain and right arm numbness, particularly when engaging in movements associated with football.

Upon consideration of the physical requirements for Graf's job as a defensive linebacker, his condition resulting from the injury and persistent symptoms, his increased risk of sustaining spinal cord injury from another forceful impact to his neck and Graf's attainment of a maximum medical improvement, the examiner concluded that his impairment as a result of the accident was permanent and that he was not physically capable of returning to his usual employment as a professional football player. The examiner also observed that surgery was a treatment option, but, as Dr. Kriss stated, its success was not guaranteed, and it would not eliminate the risk of severe injury from another forceful impact. The examiner found that Graf met the requirements for permanent disability benefits and calculated his wage loss pursuant to D.C.Code § 36–308(3)(V)(ii) (2000). The examiner determined that Graf had experienced a wage loss in excess of $2500 per week, which entitled him to the maximum compensation rate.

## II.

The employer argues that the hearing examiner's determination that Graf sustained a career-ending injury is not supported by substantial evidence in the record as a whole. Specifically, it contends that the record does not support the finding that Graf had acquired cervical stenosis which created a severe risk of injury if he continued to play professional football. The employer argues that the hearing examiner erred in reaching this conclusion primarily because he disregarded, without explanation, the testimony of Graf's primary treating physician and other distinguished physicians.

### A. *Applicable Legal Principles*

In reviewing a decision of an agency, the "findings of fact in the order under review shall be conclusive if supported by substantial evidence in the record, considered as a whole." D.C.Code § 36–322(b)(2) (2000). The decision will be upheld "if it rationally flows from the facts relied upon and those facts or findings are substantially supported by the evidence of record." *McEvily v. District of Columbia Dep't of Employment Servs.*, 500 A.2d 1022, 1023 (D.C.1985) (citations omitted). Particularly relevant to the employer's challenge here is the preference accorded to "the testimony of treating physicians over doctors retained" for purposes of the litigation. *Canlas v. District of Columbia Dep't of Employment Servs.*, 723 A.2d 1210, 1211–12 (D.C.1999) (citation omitted). In weighing conflicting medical testimony, the hearing examiner may credit the testimony of a non-treating physician over that of a treating physician. *Id.* (citing *Short v. District of Columbia Dep't of Employment Servs.*, 723 A.2d 845, 851 (D.C.1998)).

When the hearing examiner does so, however, he or she "must explain his decision to credit the one opinion over the other." *Id.* at 1212 (citing *Short*, 723 A.2d at 851). While the agency's factfinder is not required generally to explain why it favored evidence from one side over another, "there would be little force to the preference in favor of a treating doctor's opinion if the agency could ignore that opinion without explanation." *Id.; see also McKinley v. District of Columbia Dep't of Employment Servs.*, 696 A.2d 1377, 1386 (D.C.1997). With these considerations in mind, we review the record and the parties' respective arguments.

### B. *Analysis of Arguments*

The hearing examiner determined that as a result of the injury Graf sustained in the pre-season game on August 26, 1994, he was not physically able to return to work as a football player. The examiner concluded that Graf was temporarily totally disabled from March 1, 1995 until July 7, 1995 and permanently partially disabled thereafter.[4] The employer challenges only the sufficiency of the evidence to support the hearing examiner's permanent partial disability determination. In that connection, the employer contends that, relying only on the opinion of Dr. Kriss, the examiner concluded that Graf was disabled because he has acquired cervical stenosis, placing him at greater risk of permanent injury if he plays professional football. The employer contends that in reaching this conclusion, the hearing examiner erred by: (1) failing to consider other substantial medical evidence to the contrary and (2) by rejecting, without explanation, the testimony of Graf's treating physician

in favor of the evidence from a non-treating physician. Graf responds that the hearing examiner's finding that he suffered from an ongoing disability related to the work-related injury is not dependent on a finding that he suffered acquired cervical stenosis. He also contends that there is substantial evidence supporting the examiner's finding of both nerve root irritation and acquired cervical stenosis.

■ Administrative decisions under the District of Columbia Administrative Procedure Act, D.C.Code § 1–1509 (2000), must meet three basic requirements: "(1) the decision must state findings of fact on each material, contested factual issue; (2) those findings must be based on substantial evidence; and (3) the conclusions of law must follow rationally from the findings." *Perkins v. District of Columbia Dep't of Employment Servs.*, 482 A.2d 401, 402 (D.C. 1984); *see* D.C.Code § 1–1509(e) (2000). In this case, the nature and extent of Graf's injury and whether his work-related injury prevented him from returning to professional football were contested issues. The hearing examiner made findings related to these issues relying principally on the MRI scan report from Dr. Long and the testimony of Dr. Jackson, the treating physician, with respect to Graf's injury and persistent symptoms which prevented him from playing football through the time of the year-end physical. Specifically, the examiner found that the

> cervical MRI scan disclosed disc herniation at C6–7 encroaching the right nerve opening, disc bulging at C5–6 encroaching the right nerve root canal, and traumatically induced narrowing (stenosis) of the cervical spinal canal at C5–6 and

---

4. Graf remained on the injured reserve list for the team until his contract expired on February 28, 1995 and he was paid his full salary until that time. The hearing examiner found that Graf had a bachelor's degree in commu-

nications, but that he had worked only as a professional football player until that time. Graf secured employment at an average weekly wage substantially less than his salary before he sustained the injury.

C6–7.... [Graf's] radiating neck pain was caused by inflamed nerves in [his] cervical spine impinging upon the fragmented inner surface of the damaged cervical discs, all of which resulted from [Graf's] August 26, 1994 accident.

The examiner continues with findings of permanent partial disability as follows:

I find the cervical condition that resulted from [Graf's] August 26, 1994 work injury combined with the physical requirements of [Graf's] duties as a linebacker ... place [Graf] at an increased risk of sustaining severe spinal cord injury should he experience another forceful impact to his neck.... [Graf] continues to experience symptoms of radiating neck pain and right arm numbness particularly when performing physical movements like those associated with playing football. I find [Graf] reached maximum medical improvement on September 22, 1995 when his symptoms reached a plateau. I find [Graf] has retained a permanent impairment to his neck as a result of his August 26, 1994 injury. I find [Graf] is not physically capable of returning to his usual work as a football player.

There is evidence in the record supporting each of these findings. Graf testified about the specific physical requirements of his job and his persistent symptoms as described in the examiner's findings. Both Dr. Kriss and Dr. Jackson related Graf's symptoms to the work-related injury as described in the MRI report of Dr. Long.[5] However, that Graf was at increased risk for spinal cord injury because of his cervical condition is based upon the opinion of Dr. Kriss with which both Dr. Jackson and Dr. Torg disagreed. In a discussion of the compensation order, the examiner left no doubt that he was relying on the opinion of Dr. Kriss for the determination as the following excerpts from the decision show.

Dr. Kriss opined that should [Graf] experience another head on collision with either hyperextension or hyperflexion injury, [Graf] risks becoming paralyzed. Dr. Kriss further opined that while [Graf's] symptoms are caused by ruptured discs and nerve root irritation, the greater danger to [him] is the acquired cervical stenosis. Based upon his examination of [Graf] and his assessment of [his] medical records, Dr. Kriss opined that [Graf's] August 26, 1994 accident "caused an acquired cervical stenosis, or narrowing of the spine" which ended his career as a football player. Dr. Kriss opined that as a result of the stenosis, there was "very little room for the spinal cord to pass through in [that] area, and if [Graf] had another head on collision, there could be .... [sic] temporary or permanent paralysis." Thus, Dr. Kriss opined, the acquired stenosis presented the greatest risk to [Graf's] continued employment as a football player.

\* \* \* \* \* \*

Although surgery of [Graf's] neck is a treatment option for [Graf], Dr. Kriss opined the success of said surgery is not guaranteed and, even if successful, would not reduce or eliminate the risk of severe injury should [Graf] sustain another forceful impact on his head and neck. Based upon the foregoing and Dr. Kriss' opinion during his September 22, 1995 deposition, that [Graf's] condition had reached a plateau, it was determined, as was found that [Graf] reached

---

**5.** While there was some question about whether this was a herniated disc as reported by Dr. Long or a bulging disc as described by Dr. Jackson, Dr. Jackson testified that they were simply expressing the same thing in different ways. The characterization of the narrowing as "stenosis" is a point of contention between the parties discussed *infra*.

maximum medical improvement as of September 22, 1995.

Contrary to the opinion of Dr. Kriss, both Dr. Jackson and Dr. Torg expressed the opinion that Graf did not have cervical or spinal stenosis and that he was at no greater risk for sustaining permanent injury if he played football than any other player in the League.[6] Dr. Jackson and Dr. Torg also agreed that Graf's condition had improved and that his physical and neurological findings were essentially normal. While agreeing that Graf's symptoms had improved, Dr. Kriss' opinion that Graf had a career-ending injury was based upon the fact that the stenosis placed him at risk for spinal cord injury, which would be irreparable.

■ The employer argues that resolution of these particular conflicting issues was critical to a finding of a permanent disability and that it was error for the examiner to disregard, without explanation, the opinions of the treating physician, Dr. Jackson and Dr. Torg. Graf contends that the finding that he suffers from an ongoing disability as a result of his work-related injury is not dependent on the finding that he has acquired cervical stenosis as a result of the injury. Graf contends that the hearing examiner's focus was on his physical complaints and symptoms and the limitations that they placed upon his physical activities. However, if that is the case, it is not clear from the Compensation Order. There is no way to determine from the order that the hearing examiner would have found that Graf could not return to

professional football if stenosis was not present.[7] "[A]n administrative order can be sustained only upon the basis relied upon by the agency. We cannot substitute our judgment for that of the agency nor make findings on issues which the agency did not address." *Velasquez v. District of Columbia Dep't of Employment Servs.*, 723 A.2d 401, 403 (D.C.1999) (quoting *Cooper v. District of Columbia Dep't of Employment Servs.*, 588 A.2d 1172, 1176 (D.C. 1991)). Since the opinion of Dr. Kriss concerning the stenosis and its impact on Graf's career formed a significant basis for award for permanent partial disability, we agree with the employer that the conflicting medical opinions concerning whether Graf had stenosis which placed him at greater risk for irreparable spinal cord injury had to be addressed and resolved by the examiner.

Graf argues that even if the hearing examiner did not address specifically these conflicting medical opinions, it was not error. He contends that the mere existence of contrary evidence does not mean that reliance on one physician's opinion in preference to another's constitutes error. He relies on cases which hold, in other contexts, that an agency need not make specific findings of credibility in the compensation order or specify why it credits one witness over another. *See Porter v. District of Columbia Dep't of Employment Servs.*, 518 A.2d 1020, 1023 (D.C.1986); *Citizens Ass'n of Georgetown v. District of Columbia Zoning Comm'n*, 402 A.2d 36, 47

6. Dr. Jackson testified that there was some narrowing around the spinal cord, but he felt there was ample room around the spinal cord and no acquired cervical stenosis.

7. Although Dr. Jackson agreed that Graf should not play if he continued to have radiating symptoms, the Order does not indicate that the permanent disability finding was based upon this factor alone. Indeed, there

was some evidence that professional football players often play while experiencing pain. Whether Graf's other physical complaints and condition caused by the work-related injury resulted in his inability to resume playing professional football, separate and apart from the finding of stenosis, is an issue for the hearing examiner to address on remand.

(D.C.1979). In *Porter*, the hearing examiner determined that the employer's termination of the voluntary payment of benefits was justified where the petitioner's treating physician stated that there were no objective findings to support her complaints of persistent pain and arm weakness and that there was no reason that she could not return to work. 518 A.2d at 1022–23. This court concluded that in crediting the treating physician's report, it implicitly rejected petitioner's testimony, and held that the failure to make specific findings with respect to petitioner's credibility was not error. *Id.* In *Citizens Ass'n*, there were conflicting opinions among traffic experts. 402 A.2d at 44. There the petitioner argued essentially that the substantial evidence test required an agency to express reasons for finding basic facts and why it favored particular testimony. *Id.* at 45. This court held that where the agency's basic factual findings are supported by sufficient evidence, rationally lead to the conclusions of law reached, and are consistent with the applicable statute, the decision will be affirmed and "[t]he agency is not legally required to explain, in addition, why it favored one witness or one statistic over another." *Id.* at 47 (citation omitted). However, the court cautioned that there may be cases where "the evidence in support of a finding could be so weak, in contrast with evidence to the contrary, that an agency—to avoid a remand—would have to give persuasive reasons for its reliance on particular testimony; otherwise, the evidence could not be deemed 'reliable, probative, and substantial.'" *Id.* at n. 19 (citing D.C. Administrative Procedure Act § 1–1509(e) (other citation omitted)).

■ Thus, the general rule is that an agency need not specify why it credits the testimony of one witness over another, but there are exceptions. One of those exceptions exists in cases involving conflicting expert medical opinions between a treating physician and a non-treating physician. There is a preference accorded the testimony of a treating physician over a physician retained for purposes of the litigation. *Canlas, supra,* 723 A.2d at 1212 (citing *Short, supra,* 723 A.2d at 851). While the factfinder may credit the non-treating physician's testimony over that of the treating physician, he or she must explain the reason for the decision to do so. *Id.* (citation omitted). Without the explanation, the preference accorded the treating physician's opinion would have little force. *Id.*

■ In this case, the examiner did not explain why he credited the testimony of Dr. Kriss over Graf's treating physician, Dr. Jackson. *See Canlas, supra,* 723 A.2d at 1212; *see also Short, supra,* 723 A.2d at 851. He also failed to address the opinion of Dr. Torg, to whom Dr. Jackson referred Graf and with whom Dr. Jackson agreed on several material issues. The opinions held by Dr. Torg with which Dr. Jackson agreed included that: (1) Graf does not have developmental or acquired cervical stenosis; (2) except for limited cervical motion noted on two occasions immediately following the injury, Graf's objective physical and neurological findings have been essentially normal; and (3) Graf is at no greater risk of permanent neurologic injury than any of the other 1500 participants in the National Football League.[8] Dr. Jackson testified that the radiculitis caused Graf to discontinue playing professional football right after the injury, but

---

8. In reaching his conclusions, Dr. Torg reviewed the following:
 1. Records of Frederick C. Kriss, M.D.
 2. X-ray report of Robert F. Hall, M.D.
 3. MRI report of John A. Long, Jr., M.D.
 4. Office notes of Charles Jackson, M.D.
 5. Progress notes of Steven Blood, D.O.

with the proper rest and muscle strengthening exercises, Graf would be able to return to the game.[9] At no time did Dr. Jackson diagnose Graf with cervical stenosis. Dr. Jackson "did not feel that there was anything in this that would make [Graf] never able to play football again. That was not part of the equation[.]" He testified that the fact that Graf had been placed on the injured reserve list was not an indication that Graf would never play professional football again.

Dr. Kriss, a non-treating physician upon whom the examiner relied in making findings on these issues, stood alone in his diagnosis of stenosis and his opinion that this medical condition placed Graf at greater risk for future spinal injury.[10] While the examiner is free to credit the medical opinions of Dr. Kriss, the non-treating physician, and reject the opinions of the treating physician, some explanation of the reasons for that determination is required. See Canlas, supra, 723 A.2d at 1212. In this case, with the exception of Dr. Kriss, all of the other medical opinions were consistent with the opinion of the treating physician. The order indicates that the hearing examiner predicated the award of permanent partial disability upon the presence of stenosis and the risks associated with the condition to a person playing professional football. Under these circumstances, the requirement for further elaboration of the reasons for the determination is even more compelling.

The employer argues that substantial evidence in the record does not support a finding that Graf had acquired cervical stenosis. In support of this argument, the employer cites factors used to weigh the evidence and testimony of expert witnesses. We do not conclude that there is insufficient evidence in the record to support such a finding. Rather, we conclude only that the hearing examiner has not provided sufficient explanation for accepting Dr. Kriss' opinion over the opinion of the treating physician and the other medical experts who agreed with the treating physician. On remand, the hearing examiner can weigh the respective opinions of the medical experts, determine which should be credited or rejected and provide reasons for the decision. See Canlas, supra, 723 A.2d at 1212.

### III.

The employer also argues that Graf failed to establish that he sustained any economic loss as a result of his injury and therefore, the hearing examiner's determination that he is entitled to an award for permanent partial disability is not supported by substantial evidence. Specifically, the employer contends that the evidence showed that Graf's employment as a professional football player ended in 1994 for reasons unrelated to his injury. It

9. Dr. Jackson explained radiculitis as follows: If the nerve root is the radical portion of the spine, and if it is irritated, it is radiculitis. If it is damaged, it is a radiculopathy. That is just referring to that nerve root having irritation to it. I felt that it was most likely the sixth or the seventh cervical nerve root from the pattern of the pain that he had in his arm.

10. Dr. John A. Long, who performed the MRI on Graf stated that it showed "a moderate osteophyte with disc material encroaching the right C5–6 neural foramina and there is a shallow disc herniation seen at C6–7 encroaching the right nerve root canal. *The remainder of the cervical spine is unremarkable.*" (Emphasis added.) After reviewing Dr. Long's reading of the MRI, Dr. Jackson opined that Graf's nerve irritation "was not of sufficient magnitude to warrant surgical intervention. Nor did [he] feel that it would ultimately need surgical intervention, unless [Graf] continued to have incapacitating symptoms."

contends that the team terminated Graf because he no longer had the requisite skill and ability to play professional football. Graf responds that there was substantial evidence in the record supporting the hearing examiner's determination that his injury resulted in a wage loss. Further, he contends that a claimant is not required to prove that he sustained a career-ending injury, but only the nature and extent of his disability as a result of a work-related injury.

■ To qualify for an award for permanent partial disability under the Workers' Compensation Act, a claimant "must actually suffer a reduction in average weekly wages as a result of the disability." [11] *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.,* 683 A.2d 470, 473 (D.C.1996). In the context of the Act, disability is an economic concept rather than simply a medical one, and therefore it cannot be determined solely by the claimant's physical condition. *Washington Post v. District of Columbia Dep't of Employment Servs.,* 675 A.2d 37, 40–41 (D.C.1996) (citing *American Mut. Ins. Co. v. Jones,* 138 U.S.App. D.C. 269, 271–72 & n. 9, 426 F.2d 1263, 1265–66 & n. 9 (1970)) (other citations omitted). There must also be taken into consideration the claimant's "age, his industrial history, and the availability of the type of work which he can do." *Id.* The Act provides for a claimant who sustains a permanent partial disability (not specifically listed in the Act) "to receive the compensation at the time the employee returns to work or achieves maximum medical improvement," based on a specific formula.[12] D.C.Code § 36–308(3)(V)(i) (2000).

Relevant to these considerations, the hearing examiner found that Graf had sustained a work-related injury in 1994 and reached maximum medical improvement on September 22, 1995. The examiner traced Graf's education and employment history. He found that although Graf was not physically capable of returning to his usual work as a football player, which he had played professionally since 1987, Graf was capable of working in other areas. The examiner considered Graf's condition, which he concluded prevented Graf from returning to professional football. The hearing examiner also found that the employer had placed Graf on injured reserve status which prevents termination while the employee is injured. Further the examiner stated

> where an injured player's injury resolves while he is on injured reserve, he is terminated from the team and becomes a free agent eligible to sign with other teams in the league.... [Graf] remained on the injured reserve list, continued to receive conservative treatment, and did not play football for the rest of the football season.... [W]hen Dr. Jackson performed his end of the year physical examination of [Graf] in December 1994, he did not recommend that [he] be removed from injured reserve status.

The hearing examiner then calculated Graf's average weekly wage based on his weekly salary for the year 1994–95. *See* D.C.Code § 36–311 (2000). Applying the formula under D.C.Code § 36–308(3)(V)(ii)

---

11. The term disability is defined in the Act as a "physical or mental incapacity because of injury which results in the loss of wages." D.C.Code § 36–301(8) (2001).

12. D.C.Code § 36–308(3)(A)–(U) lists specific conditions (*e.g.,* arm lost, leg lost or hand lost) for which permanent partial disability may be awarded. Graf's condition falls within a catch-all provision covering other conditions. *See* D.C.Code § 36–308(3)(V)(i).

using the average weekly wage at the time of injury against the amount of salary Graf was receiving at his new employment, the hearing examiner concluded that Graf was entitled to the maximum compensation rate.[13] The examiner observed that "the nature and extent of Claimant's wage loss can be modified by Employer's demonstration that employment commensurate with claimant's physical capabilities, age, educational background, transferrable skills and employment history is available." *See Joyner v. District of Columbia Dep't of Employment Servs.*, 502 A.2d 1027, 1032 n. 4 (D.C.1986). The factors considered by the hearing examiner are relevant in determining that Graf had suffered a wage loss as a result of a work-related disability. *See Washington Metro. Area Transit Auth., supra,* 683 A.2d at 470.

However, the employer argues that Graf failed to establish that he suffered a wage loss, not only because he failed to establish that he has cervical stenosis, discussed in Part II. B. of this opinion, but also because he failed to establish that his medical condition resulted in any loss of wages. In support this argument, the employer contends that it presented substantial and unrebutted evidence that Graf was not signed for the 1995 season because of his lack of skills and not because of any disability. While the employer presented such evidence, it is not fair to say that it was unrefuted. There was substantial evidence from which the hearing examiner could find, as he did, that Graf could not play because of his injury based on the testimony of Graf and the medical experts who supported his claim. There was also evidence that Graf commenced training to shift to another position which he thought might increase his chances of playing again. Graf testified that the offensive line coach suggested it. In addition, Dr. Jackson testified that players who have the potential to play whom the team would like to keep are placed on the team roster, and if injured and unable to return to play within a reasonable time, they are placed on the injured reserve list. Graf was placed on the injured reserve list and retained until the expiration of his contract. Therefore, it could be inferred reasonably that the employer wanted to retain him. Although the team's general manager testified that Graf was terminated because of skill, he testified that the team did not terminate him until two days after he sustained the injury. Graf testified that he was not notified of the claimed termination.

The hearing examiner appears to have rejected, at least implicitly, the employer's claim that the termination was related to the employee's skill rather than his injury, and there is evidentiary support for such a conclusion. However, we cannot speculate as to whether the employer's theory was intentionally rejected or inadvertently not considered. The agency must make findings on the pivotal facts at issue, which are then accorded great deference on review. *Velasquez, supra,* 723 A.2d at 403 (citing *Washington Hosp. Ctr. v. District of Columbia Dep't of Employment Servs.,* 721 A.2d 616, 618 (D.C.1998)) (other citation omitted). This court will

---

**13.** The formula is 66 2/3% of the greater of
 (I) [t]he difference between the employee's actual wage at the time of injury and the average weekly wage, at the time of injury, of the job that the employee holds after the employee becomes disabled; or
 (II) [t]he difference between the average weekly wage, at the time the employee returns to work, of the job that the employee held before the employee became disabled and the actual wage of the job that the employee holds when the employee returns to work.
 D.C.Code § 36–308(3)(V)(ii).

not make findings on issues not addressed by the agency. *Id.* (citation omitted). Therefore, upon remand, the hearing examiner should also address explicitly the employer's claim that Graf was terminated for reasons other than a work-related injury and that his medical condition did not result in a wage loss.[14] Proceedings on remand should also include consideration of the impact, if any, of the claimant's projected work-life in the employment at the time of injury upon the wage loss under D.C.Code §§ 36–308(3)(V)(ii), -(iii).[15]

For the foregoing reasons, this case must be reversed and remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

14. As stated in the previous section of the opinion, the case must be remanded for further consideration of the findings related to Graf's medical condition as a result of his injury, a factor which must be taken into account in determining a claimant's entitlement to permanent partial disability benefits. *See Washington Post, supra,* 675 A.2d at 40.

15. It is not clear whether the agency, in noticing the availability of the modification procedure, was interpreting the statute to mean that wage loss was to be calculated without regard to the limited work-life of the profession, but with the potential for modification. It is best for the agency to address this in the first instance, since we accord considerable deference to the agency's construction of the statute it administers. *Washington Post, supra,* 675 A.2d at 40 (citations omitted).