Darla **SANDULA**, Petitioner,

v.

**DISTRICT OF COLUMBIA POLICE & FIREFIGHTERS' RETIREMENT & RELIEF BOARD, Respondent.**

No. 07–AA–622.

District of Columbia Court of Appeals.

Argued Nov. 12, 2008.
Decided Aug. 27, 2009.

Marc L. Wilhite, with whom James W. Pressler, was on the brief, Washington, for petitioner.

Richard S. Love, Senior Assistant Attorney General, with whom Peter J. Nickles, Interim Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief for respondent.

Before KRAMER and FISHER, Associate Judges, and SCHWELB, Senior Judge.

KRAMER, Associate Judge:

Officer Darla Sandula was appointed to the Metropolitan Police Department on January 23, 2006. On January 11, 2007, the Police and Firefighters' Retirement and Relief Board ("Board") convened to consider disability retirement for Officer Sandula based on a diagnosis of asthma. The Board issued an order finding that Officer Sandula was "incapacitated from further duty by reason of a disability incurred other than in the performance of duty."[1] Officer Sandula filed a petition

---

1. In its final report, the Board acknowledged that there were four issues in this case: (1) "Whether [Officer Sandula's] condition as diagnosed disables her for useful and efficient service with the [Police] Department under D.C. Official Code §§ 5-701(2) (2001) and 5-701(19) (as amended 2004)"; (2) "Whether [her] disability was or was not incurred in the performance of duty under D.C. Official Code § 5-709 or § 5-710 (2001)"; (3) "Whether [she] has five years of creditable service in the Department pursuant to D.C. Official Code § 5-713 (2001)"; and (4) "Determination Percentage of Disability, pursuant to D.C. Official Code § 5-710(e)(2)(A-D) (2001)."

The Board concluded (1) that Officer Sandula's "asthma condition disables her for useful and efficient service with the Department"; (2) that her asthma was not incurred in the performance of duty; (3) that she had less than five years of creditable service in the MPD; and (4) that because she had less than five years of creditable service, "the Board

for reconsideration, which the Board denied. Officer Sandula now petitions for review of the Board's decision. We reverse and remand.

## I.

Officer Sandula was appointed to the Metropolitan Police Department (MPD) as a Lateral Recruit on January 23, 2006. Prior to joining the MPD, Officer Sandula had been a police officer in Detroit, Michigan, for two and a half years.

At her hearing before the Board, Officer Sandula testified that she was first diagnosed with asthma in 2001 when she sought treatment for an episode of hives and was evaluated by an allergist in Michigan who, in addition to treating her for the hives, decided to give her a pulmonary function test. The allergist then told Officer Sandula that she had asthma and gave her a prescription for an inhalant, Albuterol, to be taken as needed. Her first asthma-related incident did not occur until March 2003, when she was at the Detroit Police Academy. She was participating in an exercise drill requiring her to low-crawl through weeds, and she began to feel shortness of breath and felt the need to take two puffs off her inhaler. Because this incident was the first time she had ever felt asthma symptoms, she did not know how to use her inhaler; her physical training officer, who had asthma himself, had to show her. Although Officer Sandula had never used the inhaler, she had it with her that day because she was following the Detroit Police Department's policy that all officers with asthma carry an inhaler on their person at all times.

Having applied for employment with the MPD in 2005, Officer Sandula under-went a physical examination by Dr. Paul Matera at the Police and Fire Clinic ("PFC") on November 22, 2005. At that time she disclosed in her medical questionnaire that she had asthma, with her last episode occurring in 2003. Dr. Matera evaluated Officer Sandula and found her to be medically "qualified" for employment with the MPD. In his evaluation, Dr. Matera noted that Officer Sandula had a history of "seasonal allergy/asthma." She was subsequently found "medically eligible for employment with the Metropolitan Police Department" and appointed to the MPD on January 23, 2006.

Officer Sandula testified that the second time in her life that she felt asthmatic symptoms was on March 23, 2006, during physical training at the MPD's Police Academy. It was a chilly morning, she had not eaten breakfast, and she was suffering from the symptoms of a cold. Officer Sandula completed her run, but then felt like she needed to take two puffs of her inhaler. She did so, using the original inhaler unit that she had been prescribed in 2001, and then went back into the gym and started doing push ups and sit ups. When Officer Sandula rose from doing her push ups, she "felt like [she] saw stars" and "felt kind of lightheaded," so she "put herself down." Officer Sandula testified that she did not say she could not continue physical activities; rather, she was approached by her class instructor and, subsequently, sent to the clinic by that day's physical training supervisor.

Dr. Sherene Nagarajah of the PFC placed Officer Sandula on sick leave for the rest of the day due to "acute asthma" and directed her to see her primary care

need not consider [her] capacity to occupy other employment in the D.C. Metropolitan area in order to determine the percentage of disability, and amount of annuity."

Officer Sandula challenges only the Board's first conclusion: that her asthma condition disables her for useful and efficient service with the Department.

physician. Dr. Nagarajah also stated that Officer Sandula should return to work the next day on limited duty and return to the PFC in one week. Dr. Matera cleared Officer Sandula for full duty on June 7, 2006. After reviewing her Fitness For Duty exam, he concluded that she "may return to full duty immediately; no restrictions/accommodations are warranted. She should be considered fully responsible for her actions and held to the same standards of performance as any other Police Officer considered fit for duty." Nine days later, however, the head of the PFC, Dr. Martin Rosenthal, ordered Officer Sandula back to the PFC and put her on limited duty ("no running") due to "asthma, exercise induced in a 43 Y.O." and ordered her to return for a follow-up in one month. Dr. Rosenthal noted, however, that he did not examine the patient himself, writing "Examination: Not Performed" below Officer Sandula's vital statistics. Thereafter, on August 28, 2006 (apparently without ever physically evaluating Officer Sandula), Dr. Rosenthal determined that she was "incapable of performing the tasks of a police officer" and was "permanently disabled, with a functional impairment of 10%" because of her "use of chronic inhaled steroids and her need for pretreatment prior to exercise with a bronchodilator (Albuterol)."

In finding that Officer Sandula was disabled by her asthma, the Board credited the testimony of PFC Dr. Michelle Smith–Jefferies, whom the Board found was "board certified in internal medicine, which treats asthma" and "also board certified in occupational medicine." She explained that the PFC had no written policy specifying which conditions or diseases are not acceptable for officers and firefighters and that asthma does not automatically disqualify a patient. Rather, it is a "category B condition that you have to look at certain factors."

Dr. Smith–Jefferies testified that, although she had treated "numerous asthmatics" in various settings over twenty years of clinical practice, she had seen only approximately ten asthmatics in the course of her nearly ten years with the PFC.[2] Dr. Smith–Jefferies also testified that she had never treated or examined Officer Sandula and that her opinions were based on a review of the record.[3] That record included the reports of allergist Dr. Hafez Daneshvar; internist Dr. Glynnis Moody; Associate Professor of Medicine at Georgetown University Hospital's Division of Pulmonary, Critical Care and Sleep Medicine Division, Dr. Robin L. Gross; and Dr. Bruce Bochner and Dr. Jody Tversky of the Johns Hopkins Center for Asthma and Allergic Diseases—all of whom determined that Officer Sandula's asthma was mild, easily controlled, and not an impediment to working as a police officer.[4] Nonetheless, Dr. Smith–Jefferies

2. The Board failed to note these facts. In its brief in this court, the Board attempts to bolster its reliance on Dr. Smith–Jefferies' opinion by emphasizing her twenty years of general clinical experience over her limited experience with asthmatics in the police setting. This point is unpersuasive, however, in light of the Board's stated reason for relying on the testimony of Dr. Smith–Jefferies over that of asthma expert Dr. Bruce Bochner: experience treating police officers. *See* discussion, *infra*. Moreover, common sense dictates that Dr. Bochner would likely win a contest for most asthmatics treated over the course of one's career.

3. The Board did not note these facts, either.

4. The record also included PFC Dr. Matera's June 7, 2006, clearance of Officer Sandula for duty. Thus, including Dr. Matera, a total of six physicians (four of whom were asthma specialists) determined that Officer Sandula was fit for duty after her March 2006 episode: Drs. Matera, Bochner, Tversky, Danshevar, Moody, and Gross.

considered Officer Sandula to have been "incapacitated" on March 23, 2006 because "she had to stop to take her inhaler." When the Board asked Dr. Smith–Jefferies to confirm that she considered the simple fact of stopping to take an inhaler as "be[ing] incapacitated," she replied, "I do. Could she have continued to run another, however long, you know—for another 10 minutes? There was not an indication that she could have continued on. She needed to stop to use her inhaler."

. Dr. Bochner testified on behalf of Officer Sandula at the hearing. The Board found that Dr. Bochner "has training in internal medicine with board certification in internal medicine and in the subspecialty of allergy and immunology." While these statements are true, the Board failed to note (despite Officer Sandula's counsel alerting the Board that Dr. Bochner's curriculum vitae was in the record and despite Dr. Bochner's own summary of his qualifications for the Board at the beginning of his testimony) that, in addition to being a board certified allergist and immunologist, Dr. Bochner was also the Director in Chief of the Division of Allergy and Clinical Immunology at the Johns Hopkins Asthma and Allergy Center and a professor of medicine at the Johns Hopkins University School of Medicine; that he has published and lectured extensively;[5] that he had been on the American Board of Allergy and Immunology, which writes the Board certification exam questions for trainees;

and that he was a member of the Board of Directors of the American Academy of Asthma, Allergy, and Immunology, "the premier allergy society in the U.S."[6] Likewise, the Board failed to note in its findings that Dr. Bochner had personally examined and diagnosed Officer Sandula—including administering a pulmonary test—before coming to his conclusions regarding her condition. Similarly, although the Board noted in its findings of fact that Drs. Daneshvar, Moody, and Gross had diagnosed Officer Sandula with asthma, the Board failed to note in its findings of fact that each of those physicians had—like Dr. Bochner—found that Officer Sandula's asthma was so mild that it did not impair her ability to work as a police officer because it was controllable with an inhaler. The Board also failed to note that PFC Dr. Matera had also cleared Officer Sandula for duty despite her asthma.

Dr. Bochner testified in depth at Officer Sandula's hearing. He stated that Officer Sandula had two main diagnoses: allegeric rhinitis, also known as hay fever, and "mild intermittent asthma," which, he testified, is the mildest of the four levels of asthma established by international standards. Dr. Bochner emphasized the mildness of Officer Sandula's asthma, stating that "[t]he data that we've had in front of us, including past medical records, have barely allowed us to make the diagnosis of aller-

---

**5.** Dr. Bochner's 31–page resume reflected the fact that he had authored more than 180 peer-reviewed publications, reviews, and book chapters. It also reflected the fact that he had lectured extensively on a variety of topics, including both clinical and experimental aspects of allergic diseases, listing over 115 invitations to lecture all over the world between 2000 and November 15, 2006, the date of the resume.

**6.** In its report recommending that Officer Sandula be considered for disability retirement, the Board does once refer to Dr. Bochner as a "world-renowned allergist" in its conclusions of law, but those terms did not appear in the Board's findings of fact, nor was Dr. Bochner's substantial medical experience recognized in either the Board's findings of fact or its conclusions of law. We find these omissions troubling. *Cf. Eilers v. District of Columbia Bureau of Motor Vehicles Servs.*, 583 A.2d 677, 685–86 (D.C.1990).

gic asthma"[7] because "the breathing tests that have [been] done have nominally been normal, but have shown small improvements with a single inhaler that is the first-line medicine that one gives to asthmatics." Dr. Bochner testified that "mild intermittent asthma" sufferers are "folks who have symptoms of asthma less than once a week. And since she really hasn't had symptoms of asthma in quite a long time now, if you put her in any asthma category, that would be the one" because "someone who needed an inhaler once in the last three years is someone that almost doesn't even have asthma, in my opinion."

Dr. Bochner testified that he had worked "on occasion with other individuals that have this degree of mild asthma who have an extreme need for high performance," the most common example being an athlete, who "might pre-medicate ... [by taking] a puff or two of their inhaler to prevent any kind of exercise-induced symptoms should they be concerned about that." In the alternative, he might occasionally provide an inhaled steroid "for more regular use again to give them the best possible lung function at all times, and to minimize any risk of having any exacerbation" of their asthma.

When asked by the Board about how to reconcile the precautionary measures an athlete might take with a situation where "a police officer has no way of anticipating in advance when there is a need for some kind of physical exertion," Dr. Bochner responded that the "rule of thumb" that he uses with athletes still applied here:

> Most athletes know from experience how often they have had problems with their asthma, how often they have to take themselves out of a game on a cold, damp, rainy day, for example, with a

football player. And I think for someone like Ms. Sandula or anybody in a police officer situation, a lot depends on what their baseline is, and how often they have experienced shortness of breath or wheezing that has been brought on by sudden exertion which I would imagine in her kind of job would be potentially unexpected.... [*But if*] *it was not for these one or two episodes that she's had in her entire lifetime, she really hasn't had any need for medication* .... You know, you can't ever say .... there was an absolute guarantee that on every single day of the year she won't have any asthma, I don't think anybody can guarantee that.... I think it's just incredibly unlikely that she's going to have any problem ... (emphasis added).

To that end, Dr. Bochner stated that the triggers for Officer Sandula's asthma were seasonal allergies, exercise, cold air, and respiratory infections. However, "since she starts from essentially normal lung function, those triggers often have much less of an impact in general than someone who's starting at, say, 50 percent normal lung function and then gets worse from there," and there was "no reason to suspect" that Officer Sandula's condition would change from mild to either moderate or severe, because—

> any given individual has his or her own set of triggers, and how much those triggers alter the severity of their condition.... During [her lifetime] ... she has been, like we all probably would have, she's probably had some respiratory infections. She has been exposed to cold air, she has been exposed to allergens, and I think the allergen load and

---

7. Dr. Bochner explained that "allergic asthma" refers to asthma that has allergies as a trigger.

type would be similar in Michigan as it would be in Virginia or in the Mid–Atlantic in general. And yet, she has needed an inhaler once [in the last three years]. So to me the degree of her disease is so mild, she's kind of withstood the test of time, and there is no reason to suspect that that would change in any major way over time.

Dr. Bochner explained to the Board that Albuterol was a "first-line medicine" and if a patient needs Albuterol "less than once a week, that's usually all they're given for their asthma." Maximum relief from Albuterol would come in about fifteen minutes, but it would start working "within a minute." Both Dr. Bochner and Officer Sandula confirmed that Officer Sandula was "currently on absolutely no asthma medicines other than [simply] carrying the Albuterol." Dr. Bochner answered the Board's question regarding the level of risk that Officer Sandula would suffer a "disabling acute asthma attack" as being "extremely, extremely low risk" and that the two episodes Officer Sandula had experienced were not "disabling" because they

were "handled that day" with only "one dose."

In response to Board inquiry, Officer Sandula testified that although she had only two asthmatic incidents in her life and each was resolved with a single dose of Albuterol,[8] she would be willing to regularly pre-medicate before going on duty and would be willing to make such pre-treatment a condition of her employment.

## II.

 We review a decision of the Board to ensure that it "(1) made findings of fact on each material, contested factual issue, (2) based those findings on substantial evidence, and (3) drew conclusions of law which followed rationally from the findings." *Shaw v. District of Columbia Police & Firefighters' Retirement & Relief Bd.*, 936 A.2d 800, 805 (D.C.2007). "If the decision is not supported by substantial evidence in the record, we must set it aside." *Id.* (citing *Bausch v. District of Columbia Police & Firefighters' Retirement & Relief Bd.*, 855 A.2d 1121, 1124

---

8. Officer Sandula testified that she works out four to five days a week. Normally, she goes to the Academy and does an hour on the treadmill with the goal of reaching a 500 calorie burn, followed by twenty to thirty minutes on a stationary bicycle, plus a weight training program that she performs two to three times a week, in addition to using the punching bag. Also, although she could not swim at the Academy as often as she would like because she was only a recruit, when a sworn officer is present, she goes in the pool and swims a mile (72 laps).

Officer Sandula also testified that during her two and a half years with the Detroit Police Department, she had to chase, wrestle, or fight people on occasion, and that she never had to use her inhaler. This testimony was corroborated by letters from Officer Sandula's former co-workers at the Detroit Police Department. Sgt. Eric C. Bucy, a ten-year veteran officer with nine commendations and seven citations, worked with Officer Sandula

on at least fifty shifts over the course of two years, on the street, during "several foot and vehicular chases." During that time, he never saw nor heard of Officer Sandula "requir[ing] any medical assistance after any physical confrontation or chase," nor "suffer[ing] from any physical distress while performing her functions as a Detroit Police Officer." Ten-year veteran of the Detroit Police Department Officer Treva Eaton, who served as Officer Sandula's Field Training Officer for two years, wrote that "[i]t is to my surprise to find out that she is an asthmatic, as I have even witnessed stressful times that would have likely triggered an episode." As an example, Officer Treva cited a foot pursuit in which "Officer Sandula pursued a 15 year old suspect fleeing from a stolen vehicle. She chased him approximately four blocks on foot, ultimately resulting in his detainment. In no way were her physical abilities impeded upon."

(D.C.2004)). Substantial evidence is "more than a mere scintilla. It is relevant evidence such as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Epstein, Becker & Green v. District of Columbia Dep't of Employment Servs.*, 812 A.2d 901, 902–03 (D.C. 2002)).

 "[A]n administrative order can only be sustained on the grounds relied on by the agency." *Walsh v. District of Columbia Bd. of Appeals & Review*, 826 A.2d 375, 380 (D.C.2003). But we "may not uphold an agency's decision by referring only to those parts of the record which support the agency." 6 JACOB A. STEIN, GLENN A. MITCHELL, BASIL J. MEZINES, ADMINISTRATIVE LAW § 51.02[1], at 51–147 to – 148 (2008). *See also Eilers v. District of Columbia Bureau of Motor Vehicles Servs.*, 583 A.2d 677, 685 (D.C.1990) ("A reviewing court must scrutinize the record as a whole.") Rather, we must view the entire record, which "means that the court must take account of evidence in the record which detracts from the evidence relied on by the agency" as well. 6 STEIN, *supra*, § 51.02[1], at 51–148; *Eilers, supra*, 583 A.2d at 685 ("The limitations of 'cold' transcripts notwithstanding, reviewing courts are not absolutely bound by the credibility findings of administrative officers or agencies"). "Although the ALJ generally is upheld on credibility determinations, there are certain times when a court must override such a determination by examining evidence in the record that detracts from the ALJ's finding." ... [While the ALJ] " 'is best suited to make credibility determinations . . . we may also disregard these credibility determinations where we find them to be unreasonable, self-contradictory or based on inadequate reasoning.' " (citations omitted).

 Indeed, it has been long recognized that "evidence that is slight in relation to much stronger contrary evidence is not substantial evidence." 2 PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 11.2, at 771–72 (4th ed.2002) (citing Frank E. Cooper, *Administrative Law: The Substantial Evidence Rule*, 44 A.B.A.J. 945, 100–03 (1958), and noting that with the exception of a relaxation of the hearsay rules in administrative proceedings, Professor Cooper's guidelines for applying the substantial evidence test are generally still used today). Therefore, although an agency is normally "not legally required to explain why it favored one witness or one statistic over another ... there may be cases where the evidence in support of a finding could be so weak, in contrast with evidence to the contrary, that an agency—to avoid a remand—would have to give persuasive reasons for its reliance on particular testimony; otherwise, the evidence could not be deemed reliable, probative, and substantial." *Pro–Football, Inc.*, 782 A.2d at 744 (citing *Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Commission*, 402 A.2d 36, 47 n. 19 (D.C.1979) (internal quotation marks omitted)); *Eilers, supra*, 583 A.2d at 684 (quoting same). *Accord*, 2 PIERCE, *supra*, § 11.2, at 778 ("When the evidence is in conflict ... [t]he agency must explain, however, why it chose to rely on some probative evidence when it was confronted with the conflicting evidence."). Indeed, although a " 'certain amount of inconsistency in the evidence is almost inevitable in any trial, [and] it rarely justifies reversal,' at least where the degree of inconsistency is not 'abnormal,' " *Eilers, supra*, 583 A.2d at 684 (citation omitted), "there may be certain basic findings of fact on contested issues which are so thinly supported by evidence of record that still other findings would be required to demonstrate that there is 'reliable, probative, and substantial evidence' to support them." *Id.* (quoting *Citizens Ass'n of*

*Georgetown, Inc., supra,* 402 A.2d at 47 n. 20).

■ Accordingly, "[a]lthough our review of agency decisions is deferential, it is by no means 'toothless.' Our principal function 'in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues.'" *Georgetown Univ. Hosp. v. District of Columbia Dep't of Employment Servs.,* 916 A.2d 149, 151 (D.C.2007) (citing *Dietrich v. District of Columbia Bd. of Zoning Adjustment,* 293 A.2d 470, 473 (D.C.1972); *Gay v. Dep't of Employment Servs.,* 644 A.2d 1326, 1328 (D.C.1994)); *Eilers, supra,* 583 A.2d at 685 ("A reviewing court must scrutinize the record as a whole and, although 'it is not our task to assess the facts of this case *de novo,* neither [are we] to function as a judicial echo or rubber stamp for the conclusions of the [agency].'"). The court can perform this function only "when the agency discloses the basis of its order by an articulation with reasonable clarity of its reasons for the decision." *Georgetown Univ. Hosp., supra,* 916 A.2d at 151 (citing *Dietrich, supra,* 293 A.2d at 473; *Felicity's Inc. v. District of Columbia Bd. of Appeals & Review,* 851 A.2d 497, 502 (D.C.2004); *Branson v. District of Columbia Dep't of Employment Servs.,* 801 A.2d 975, 979 (D.C.2002)).

### III.

■ Officer Sandula argues that the Board erred in relying on the opinion of PFC Dr. Michelle Smith–Jefferies over the opinions of six other physicians, including Dr. Bochner.[9] Thus, the case before us is not about whether Officer Sandula is, in fact, disabled by her asthma or whether her asthma makes her unfit for duty as a police officer. This case is about whether the Board's opinion demonstrates its having given "full and reasoned consideration to all material facts and issues" when reaching its decision to credit the opinion of Dr. Smith–Jefferies over the opinions of Dr. Bochner and the five other physicians who considered her not to be disabled and whose opinions were all in the record upon which Dr. Smith–Jefferies' opinion was solely based.

Because Dr. Smith–Jefferies' testimony is in such contrast to that of Dr. Bochner and to the reports of the five other physicians who cleared Officer Sandula for duty despite her having asthma,[10] to avoid remand the Board needed to give "persuasive reasons" for its decision to rely on the minority opinion of general practitioner Dr. Smith–Jefferies over the opinions of six other physicians, four of whom were specialists in the condition at issue,[11] and one of whom was not only a specialist but also a world-renowned expert and lecturer in the matter.[12] *Pro–Football, Inc., supra,*

9. *See* note 4, *supra.*

10. *See* note 4, *supra.*

11. As noted above, Drs. Bochner, Danshevar, Tversky, and Gross are all asthma and immunology specialists.

12. This requirement is separate from the requirement that a fact-finder explain its reasoning for crediting a non-treating physician's testimony over that of a treating physician. *Pro–Football, Inc. v. District of Columbia Dep't of Employment Servs.,* 782 A.2d 735,

744 (D.C.2001). That requirement was met in this case as to Dr. Bochner when the Board stated that it preferred the testimony of Dr. Smith–Jefferies (a non-treating physician) over the testimony of Dr. Bochner (a treating physician) because Dr. Smith–Jefferies' "expertise in occupational medicine and clear understanding of the physical demands faced by the Department's members affords her opinion more weight than the opinion expressed by Dr. Bruce Bochner."

Thus the issue here is not whether the Board provided a reason for preferring the opinion of a non-treating physician over the

782 A.2d at 744; *Eilers, supra,* 583 A.2d at 685–86; *Georgetown Univ. Hosp., supra,* 916 A.2d at 151 (Our job is to "assure that the agency has given full and reasoned consideration to all material facts and issues ... [and t]he court can only perform this function when the agency discloses the basis of its order by an articulation with reasonable clarity of its reasons for the decision.... [O]therwise, the evidence [cannot] be deemed reliable, probative, and substantial ... [because we cannot] assure that the agency has given full and reasoned consideration to all material facts and issues."). *Accord,* 2 PIERCE, *supra,* § 11.2, at 771–72 ("[E]vidence that is slight in relation to much stronger contrary evidence is not substantial evidence."). The Board provided no such reason.

To the extent the Board intended to rely on the reason it gave for preferring Dr. Smith–Jefferies' opinion as a non-treating physician over that of Dr. Bochner as a treating physician, that reason (that her "expertise in occupational medicine and clear understanding of the physical demands faced by the Department's members affords her opinion more weight than the opinion expressed by Dr. Bruce Bochner") is unpersuasive. The only example of such a scenario that the Board cited (and the only police work-related scenario that Dr. Smith–Jefferies provided in her testimony, though she returned to this scenario repeatedly) was one in which a police officer might have to wrestle with or chase a suspect under circumstances where some or all of her trigger factors were present.[13] But no special expertise is needed to understand that a police officer might have to run down or wrestle a suspect in a situation presenting all of his or her trigger factors at once. Where, as here, the particular knowledge cited to justify crediting the minority position is actually common knowledge, that knowledge alone is not a persuasive reason for crediting the minority opinion of one, non-specialist doctor over that of six other doctors, four of whom are specialists in the medical condition at issue and one of whom is a board-certified, world-renowned expert in the condition.[14] Indeed, Dr. Bochner specifi-

opinions of treating physicians, but rather whether the Board has provided a persuasive reason for choosing to credit the minority opinion of *one, non-specialist* doctor (who happens to be a non-treating physician) over that of *six* other doctors (all of whom happen to be treating physicians) where at least *four* of them are specialists in the medical condition at issue, and one of the specialists is a board-certified, *world-renowned expert* in the condition and a professor who helped establish the standards in the field.

13. The Board cites on appeal Dr. Smith–Jefferies' testimony that she could not agree with Dr. Bochner's testimony that pre-treatment would make it "extremely" unlikely for Officer Sandula to suffer a severely disabling asthma attack because—

she knows the triggers, which leads me to believe that there [have] been ... enough incidents for her to have some understanding about the disease, about her asthma.

And so, based on that, I can't say that I feel comfortable that it's very unlikely that she would have a problem.
We are putting her in an environment where she might be exposed to all triggers. On a cool spring day, she has to chase a suspect or wrestle with a suspect. I can't control for that. And so what you've done is put her in a position where all the triggers are coming together at once. And that is likely to cause a problem.
The Board did not provide any reason for crediting Dr. Smith–Jefferies' opinion over those of treating physicians Drs. Matera, Tversky, Danshevar, Moody, and Gross, all of whose opinions were in the record.

14. Indeed, if experience treating police officers in general were sufficient to justify reliance on a doctor's opinion no matter how much evidence ran to the contrary, the PFC's doctor's opinion would *always* be entitled to more weight than any other doctor, without regard to whether the PFC's doctor was a

cally testified that pre-treating Officer Sandula would address a situation involving all of Officer Sandula's trigger factors.

## IV.

In short, "[o]ur principal function 'in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues.'" *Georgetown Univ. Hosp., supra,* 916 A.2d at 151. This requires agencies to provide "the basis of [their] order[s] by an articulation with reasonable clarity of its reason for the decision." *Id.* Because the Board chose to credit evidence that is "so weak, in contrast with the evidence to the contrary," to avoid a remand, it needed to "give persuasive reasons for its reliance on [that] particular testimony." *Pro–Football, Inc., supra,* 782 A.2d at 744; *Eilers, supra,* 583 A.2d at 684. Because the Board did not provide a persuasive reason for relying on the mi-

nority opinion of one general physician over those of a half dozen other physicians, at least four of whom are specialists in the medical condition at issue and one of whom is an internationally-recognized expert in the condition, we cannot say that the evidence upon which the Board's decision rested was substantial, and we must remand. *Walsh, supra,* 826 A.2d at 380 ("[A]n administrative order can only be sustained on the grounds relied on by the agency."); *Pro–Football, Inc., supra,* 782 A.2d at 744; *Eilers, supra,* 583 A.2d at 684.[15]

For the forgoing reasons, the Board's decision is

*Reversed and remanded for further proceedings consistent with this opinion.*

treating physician. This result is unacceptable under our case law, however, which has squarely rejected the possibility of automatic deference to a non-treating physician by requiring administrative agencies to provide reasons for their decision to reject the testimony of a treating physician and to credit the testimony of another physician when there is conflicting medical evidence. *E.g., White v. District of Columbia Dep't of Employment Servs.,* 793 A.2d 1255, 1258 (D.C.2002). Moreover, the given reason undermines the Board's own argument, as Officer Sandula was also cleared for duty by PFC Dr. Matera, who, as a doctor with the PFC, surely also has experience treating police officers.

15. The requirement that the Board provide a persuasive reason for choosing "evidence that is slight in relation to much stronger contrary evidence," 6 PIERCE, *supra,* § 11.2, at 722, would apply even if the doctors' substantive opinions in this case had been reversed. *See* 6 STEIN, *supra,* § 51.02[1], at 51–157 to –159 (noting that courts may not "impose a double standard[;] that is, the application of the rule must remain constant regardless of the remedy fashioned by the agency"). As noted above, the issue before us is not whether

Officer Sandula is, in fact, disabled by her asthma or whether her asthma makes her unfit for duty as a police officer. Rather, the issue is whether the Board gave "full and reasoned consideration to all material facts and issues" when reaching its decision to credit the opinion of one non-specialist doctor over the opinions of a half dozen other doctors, at least four of whom are specialists in the relevant medical condition and one of whom is not only a specialist but also a world-renowned expert in the condition. Thus, if the doctors' substantive opinions in this case had been reversed-that is, if the Board had chosen to rely on the opinion of one non-specialist doctor that Officer Sandula was fit for duty while the world-renowned expert and five other doctors, including three other specialists, had found her disabled-the Board would likewise be required to provide a persuasive reason for crediting the opinion of the one non-specialist doctor over those of the world-renowned expert and the nearly half-dozen other doctors because the testimony the Board would have chosen to credit would still be "so weak, in contrast with evidence to the contrary." *Pro–Football, Inc., supra,* 782 A.2d at 744; *Eilers, supra,* 583 A.2d at 684.